No. 44,620

STATE OF KANSAS, ex rel. ROBERT C. LONDERHOLM, Attorney General, and KEITH SANBORN, County Attorney of Sedgwick County, Kansas, *Appellees*, v. CLARK V. OWENS, as Judge of the Juvenile Court of Sedgwick County, Kansas, *Appellant*.

(416 P. 2d 259)

Opinion filed June 28, 1966.

*Robert A. Coldsnow,* of Wichita, argued the cause, and *E. Lael Alkire,* also of Wichita, was with him on the brief for the appellant.

*Richard H. Seaton,* Assistant Attorney General, argued the cause, and *Robert C. Londerholm,* Attorney General, and *Keith Sanborn,* County Attorney, were with him on the brief for the appellees.

The opinion of the court was delivered by

SCHROEDER, J.: This is an appeal by the judge of the juvenile court of Sedgwick County, Kansas, (defendant-appellant) from an order of mandamus issued by the district court compelling him to accept jurisdiction over 16 and 17-year-old boys who appear to

be delinquent, miscreant or wayward under Chapter 278, Laws of 1965, which amended certain sections of the Kansas juvenile code (K. S. A. 38-801, *et seq.*). The order of mandamus was secured by the state, on the relation of the attorney general of Kansas and the county attorney of Sedgwick County, after the defendant had refused to accept jurisdiction in all such cases on the ground that the act conferring jurisdiction was unconstitutional in its entirety. The district court upheld the constitutionality of the act in all respects.

The underlying question on appeal is whether Chapter 278, Laws of 1965, is in whole or in part unconstitutional.

The state in its petition, filed January 17, 1966, alleged under Section 2 of the act (Senate Bill No. 31—L. 1965, ch. 278) the juvenile court of Sedgwick County has exclusive original jurisdiction in proceedings concerning a child living or found within Sedgwick County, had a duty under this act to assume jurisdiction in such proceedings; that the judge of said court has refused and continues to refuse to assume jurisdiction in all proceedings concerning a child who appears to be delinquent, miscreant or wayward, and who was 16 or 17 years of age, as required by the act.

The defendant in his answer, filed January 26, 1966, alleged that he:

". . . did take jurisdiction, as Juvenile Judge of Sedgwick County, Kansas, of Case No. 16537 in the Juvenile Court of Sedgwick County, Kansas, in a matter entitled 'In the Interest of [name omitted], a male minor under the age of 18 years, to-wit: 16 years', in which said matter the said alleged child was charged with the offense of 'glue sniffing' and was charged as a wayward child by reason thereof. That said child had several previous adjudications as a wayward or miscreant child, and by reason of the provisions of L. 1965, Ch. 278, Sec. 6 (a) (5), would have subjected said child to a possible sentence in the Kansas Industrial Reformatory at Hutchinson, Kansas. That the acts upon which said child was charged are neither a misdemeanor nor a felony under the laws of the State of Kansas. That in said proceedings, this defendant did, as Juvenile Judge of the Juvenile Court of Sedgwick County, Kansas, pass upon the constitutionality of the provisions of L. 1965, Ch. 278, Secs. 1 through 9, and in said action did determine [on January 11, 1966] that said L. 1965, Ch. 278, Secs. 1 through 9 generally known as Senate Bill No. 31 was unconstitutional in its entirety. . . ."

The answer further stated the defendant's reasons for declaring the act unconstitutional.

The mandamus action was tried in the district court on February 15, 1966, and after taking the matter under advisement, the trial court on March 3, 1966, made its findings and conclusions.

On March 7, 1966, the trial court granted the writ of mandamus commanding the defendant to forthwith assume jurisdiction in all proceedings concerning the person of a child 16 or 17 years of age who appears to be delinquent, miscreant or wayward as defined in the act, but stayed the force and effect of the judgment until the matter could be determined on appeal by the Supreme Court. This stay was later modified on March 9, 1966, to grant a stay of 30 days from March 3, 1966, to allow time for appeal to the Supreme Court and for any further application for additional stay to the Supreme Court. The appellant filed a motion in the Supreme Court to stay the order of the district court on the 21st day of March, 1966, and on the same day the parties were granted an oral hearing, following which the motion for stay was denied and the case was advanced to the May session for hearing.

In general the act in question amended the Kansas juvenile code to extend jurisdiction of the juvenile court to include boys 16 and 17 years of age who appear to be delinquent, miscreant or wayward as defined in the act. Prior to the amendment it included girls less than 18 years of age and boys less than 16 years of age falling within the provisions of the Kansas juvenile code.

This feature of the act, extending the jurisdiction of the juvenile court to include 16 and 17-year-old boys, is not in controversy. If this was the only change made in the Kansas juvenile code by the act in question, it must be conceded to be entirely within the prerogative of the legislature to extend such jurisdiction to the juvenile court.

It is the other amendments made by the act in question that give rise to this controversy. Generally they empower the judge to determine whether 16 and 17-year-old boys who commit an act of delinquency are amenable to juvenile court treatment, and if not, to dismiss the juvenile proceedings and direct the county attorney to prosecute in the criminal courts. In addition, they authorize the court to commit certain boys in this age group to the state industrial reformatory, as well as to those institutions previously authorized for younger boys.

A brief consideration of the significant sections of the act in question will serve as a basis for further discussion of the basic issue in the case.

Section 1 of the act defines the terms used. Among these provisions it defines a "Delinquent child" as:

". . . a child less than eighteen (18) years of age:

"(1) Who does an act other than one defined in subsection (e) of this section, which, if done by a person eighteen (18) years of age or over, would make him liable to be arrested and prosecuted for the commission of a felony as defined by K. S. A. 62-104; or

"(2) who has been adjudged a miscreant child under this act three (3) or more times."

It defines a "Miscreant child" as:

". . . a child less than eighteen (18) years of age:

"(1) Who does an act, other than one defined in subsection (e) of this section, which if done by a person eighteen (18) years of age or over, would make him liable to be arrested and prosecuted for the commission of a misdemeanor as defined by K. S. A. 62-105;

"(2) who does an act, other than one defined in subsection (e) of this section, which, if done by a person eighteen (18) years of age or over, would make him liable to be arrested and prosecuted for the violation of any ordinance, police regulation, order, rule or regulation adopted by any authority, city, county, township, or other political subdivision of this state; or

"(3) who has been adjudged a wayward child under this act three (3) or more times."

It defines a "Wayward child" as:

". . . a child less than eighteen (18) years of age:

"(1) Whose behavior is injurious to his welfare;

"(2) who has deserted his home without good or sufficient cause; or

"(3) who is habitually disobedient to the reasonable and lawful commands of his parent, guardian, or other lawful custodian."

Section 2 of the act, with certain exceptions, confers upon the juvenile court of each county of this state *exclusive original jurisdiction* in proceedings concerning the person of a child living or found within the county who appears to be delinquent, miscreant, wayward, a traffic offender, a truant or dependent and neglected, as defined in K. S. A. 38-802. It further provides when jurisdiction has been acquired by the juvenile court over the person of a dependent and neglected child it may continue until the child has attained the age of 21 years. It also provides that when a child charged with having committed an act of delinquency before reaching the age of 18 years is brought before the judge of the juvenile court after reaching such age, the jurisdiction of the juvenile court over such person for any such act shall not expire on account of the child having arrived at the age of 18 years, but such child shall continue under the jurisdiction of the juvenile court for such act until he is finally discharged by the juvenile court or has reached the age of 21 years.

Section 3 provides:

"Existing K. S. A. 38-808 is hereby amended to read as follows: 38-808. (*a*) This subsection (*a*) shall apply to all cases under the jurisdiction of the juvenile court involving offenses committed by a child less than eighteen (18) years of age, which, if done by a person eighteen (18) years of age or over, would make him liable to be arrested and prosecuted for the commission of a felony as defined by K. S. A. 62-104. In all such cases the judge of the juvenile court *may* refer the child apprehended to the district court for trial by jury and, upon a verdict that such child is a delinquent child as defined in K. S. A. 38-802, the district court shall remand the case to the juvenile court for judgment.

"(*b*) Notwithstanding any provisions of the Kansas juvenile code or any other law of this state to the contrary, *at any time during a hearing upon a petition alleging that a child is, by reason of violation of any criminal statute, a delinquent child* described in K. S. A. 38-802 (*b*) (1), *when substantial evidence has been adduced to support a finding that the offense alleged is punishable as a felony under the general law and that the child was sixteen (16) years of age or older* at the time of the alleged commission of such offense, *and that the child would not be amenable to the care, treatment and training program available through the facilities of the juvenile court, the court may make a finding, noted in the minutes of the court, that the child is not a fit and proper subject to be dealt with under the Kansas juvenile code,* and the court shall direct the county attorney of the proper county to prosecute the person under the applicable criminal statute and thereafter dismiss the petition or, if a prosecution has been commenced in another court but has been suspended while juvenile court proceedings are held, shall dismiss the petition and issue its order directing that the other court proceedings resume." (Emphasis added.)

Section 3 (*b*) is entirely new and authorizes the juvenile court to waive its *exclusive original jurisdiction.*

Section 4 defines peace officers and delineates their duties upon arrest of a child taken into custody who is under the age of 18 years. It also provides for the referral of cases from other courts with a specific proviso concerning traffic offenders. It further provides:

"(*f*) Neither the fingerprints nor a photograph shall be taken of any child less than eighteen (18) years of age, taken into custody for any purposes, without the consent of the judge of the court having jurisdiction; and when the judge permits the fingerprinting of any such child, the prints shall be taken as a civilian and not as a criminal record.

"(*g*) All records in this state concerning a public offense committed or alleged to have been committed by a child less than eighteen (18) years of age, shall be kept separate from criminal or other records, and shall not be open to inspection, except by order of the juvenile court; and it shall be the duty of any peace officer, justice of the peace, county judge, police magistrate, city judge or city police judge, or other similar officer, making or causing to be made any such record, to at once report to the judge of the juvenile court of his county the fact that such record has been made and the substance thereof together with all of the information in his possession pertaining to the making of such record.

"(h) When a record has been made by or at the instance of any peace officer, justice of the peace, county judge, police magistrate, city judge or city police judge, or other similar officer, concerning a public offense committed or alleged to have been committed by a child less than eighteen (18) years of age, the judge of the juvenile court of the county in which such record is made shall have the power to order such officer, justice, magistrate or judge to expunge such record; and, if he shall refuse or fail to do so within a reasonable time after receiving such order, he may be adjudged in contempt of court and punished accordingly."

Section 5 relates to the proceedings to be taken in the juvenile court generally.

Section 6 provides in part:

". . . (a) When a child has been adjudged to be a *delinquent child or a miscreant child* under the provisions of this act, the judge of the juvenile court may make an order to:

"(1) Place such child on probation in the care and custody of either or both of his parents, subject to such terms and conditions as the juvenile court may deem proper;

"(2) place such child in the care, custody and control of a duly appointed probation officer or other suitable person, subject to such terms and conditions as the juvenile court may deem proper;

"(3) place such child in a detention home, parental home or farm, subject to such terms and conditions as the juvenile court may deep proper;

"(4) place such child in the care of a children's aid society, subject to such terms and conditions as the juvenile court may deem proper: *Provided, however,* That if such child is a boy, sixteen (16) years of age or over, the juvenile court may place such child in the county jail pending final disposition or may place him on probation on such terms and conditions as the juvenile court may deem proper;

"(5) *commit such child,* if a boy under the age of sixteen (16), to the state industrial school for boys, *or if a boy sixteen (16) years of age or over to either the state industrial school for boys, or the state industrial reformatory: Provided,* No boy sixteen (16) years of age or over shall be committed to the state industrial school for boys unless such commitment has received the prior approval of the director of the division of institutional management, *and if any boy sixteen (16) years of age or over is committed to the state industrial reformatory such commitment shall be subject to the same conditions and rights as would be the case if such commitment were made by a district court;* or

"(6) commit such child, if a girl, to the state industrial school for girls." (Emphasis added.)

Section 6 (a) (5) is new. Prior to amendment it simply read:
"commit such child, if a boy, to the state industrial school for boys; or"

The remaining three sections of the act are not of particular significance to our decision in this case to warrant attention, except to note that the act contains no saving clause if a portion thereof is declared to be unconstitutional.

Other sections of the Kansas juvenile code are also important to a consideration of the basic question involved.

K. S. A. 1965 Supp. 38-821 provides that in all hearings the judge of the juvenile court shall appoint a guardian *ad litem* to appear for, represent, and defend a child who is the subject of proceedings under the Kansas juvenile code. It further provides the guardian *ad litem* shall make an independent investigation of the facts and representations made in the petition and he may be allowed a reasonable fee for such services, to be fixed by the juvenile court.

The introductory section of the Kansas juvenile code is K. S. A. 38-801 and relates to the construction of the code. It provides:

"This act shall be liberally construed, to the end that each child coming within its provisions shall receive such care, custody, guidance, control and discipline, preferably in his own home, as will best serve the child's welfare and the best interest of the state. *In no case shall any order, judgment or decree of the juvenile court, in any proceedings under the provisions of this act, be deemed or held to import a criminal act on the part of any child; but all proceedings, orders, judgments and decrees shall be deemed to have been taken and done in the exercise of the parental power of the state.* This section shall not apply to proceedings under section 30 [38-830] of this act." (Emphasis added.)

The trial court, after finding that the defendant refused to assume jurisdiction of any proceedings concerning the person of a child 16 or 17 years of age who appeared to be delinquent, miscreant or wayward, as defined in Chapter 278, Laws of 1965, because, in his opinion, the act was unconstitutional, made additional specific findings based directly upon the sections of the act in question, 38-801, *supra,* and 38-821, *supra,* by paraphrasing their provisions. The trial court in its findings also quoted K. S. A. 76-2110 and K. S. A. 76-2320. Upon such findings the trial court concluded:

"1. The legislature of this state has provided that the juvenile court shall have exclusive original jurisdiction over all proceedings concerning children under eighteen years of age.

"2. The legislature of this state has provided that no order, judgment or decree of the juvenile court, in any proceedings under the provisions of the Juvenile Code shall be deemed or held to import a criminal act on the part of any child. A child being held by the juvenile court pending a hearing or awaiting the direction or decision of the juvenile court is not being held as a criminal or for having committed a criminal act. A child involved in a proceeding in the juvenile court, not being held for having committed a criminal act, is not deprived of any constitutional right when bail or jury trial is not provided.

"3. The State Industrial Reformatory was established by the legislature as a reformatory. The operation and programs of the State Industrial Reformatory are for the purpose of reforming individuals.

"4. The legislature has a right to designate the place of confinement for the reformatory treatment of the juvenile person. A juvenile sent to the reformatory by the juvenile court is not convicted of any crime nor is he sentenced to the institution for any crime. The juvenile is committed to the reformatory, and his commitment cannot be held to import a criminal conviction.

"5. The juvenile court does not relinquish jurisdiction or control over a juvenile because the State Industrial Reformatory is designated as the place of confinement.

"6. The Laws of 1965, Chapter 278, Sections 1 through 9 which vest in the juvenile court the discretion, after making certain findings, as to which court a person alleged to have violated a criminal statute, punishable as a felony, shall be handled is not an unconstitutional or unlawful delegation of legislative power to the judicial authority.

"7. The fact that the vesting of such discretion in the juvenile court may be a very desirable judicial power is best illustrated by the juvenile judge when he stated, 'As a matter of fact, in the case at bar there probably isn't anything the court could do but commit this boy to the State Industrial Reformatory for the reason that this boy has also had several miscreancy adjudications and the court has used all the facilities at its command in attempting to rehabilitate this young man."

"8. Chapter 278, Sections 1 through 9 of the Laws of 1965 violates neither the Constitution of the United States or the State of Kansas in any manner as alleged by the defendant. It is a valid exercise of the power and authority of the legislature of this state in its duty to guard and protect the interests of children and to protect and control them.

"9. The order of mandamus prayed for by the plaintiff should be and the same is hereby granted commanding the defendant to forthwith assume jurisdiction in all proceedings concerning the person of a child sixteen or seventeen years of age who appear to be delinquent, miscreant, or wayward as defined in the Laws of 1965, Chapter 278, Sections 1 through 9. This order of mandamus is to become effective forthwith."

The theory of juvenile proceedings for the state of Kansas has already been clearly enunciated. (*In re Turner*, 94 Kan. 115, 145 Pac. 871; *In re McCoy*, 184 Kan. 1, 334 P. 2d 820; and *Lennon v. State*, 193 Kan. 685, 396 P. 2d 290.) The *McCoy* case was decided before the provisions of 38-801, *supra*, were enacted, but they are substantially the same as the prior law (G. S. 1949, 38-415) upon which the *McCoy* case was decided. In the *McCoy* case this court said:

"Without attempting to summarize all of the foregoing sections of the statutes, the law-making body in its legislative wisdom has by the above section of the statute proscribed the nature of a juvenile proceeding. The action of a juvenile court is deemed to have been taken and done in the exercise of the parental power of the state. These statutes are an assertion upon the part of the state of its right to exercise its power as *parens patriae* for the

welfare of such of its minor citizens as are deprived of proper parental control and oversight, and are disposed to go wrong.

"The old Spartan theory that the child and the citizen are for the state has been reversed by our civilization. It regards the state as an institution for the good of the child and the citizen, still the state as *parens patriae* may exercise over the child parental care and authority in order that he may receive the highest good from the state and achieve the best results for himself thus guarded and directed in youth. This is but a recognition of the duty of the state, as the legitimate guardian and protector of children where other guardianship fails. *No constitutional right is violated,* but one of the most important duties which organized society owes to its helpless members is performed, just in the measure that the law is framed, with wisdom. It is to be carefully administered. *Statutes of this kind are parental and as such a jury may not be demanded as a matter of constitutional right.* (*In re Turner,* 94 Kan. 115, 145 Pac. 871; and see, also, *Richardson v. Browning,* 18 F. 2d 1008.) The history of our law and the statutes are reviewed in the Turner case." (pp. 8, 9.) (Emphasis added.)

From the foregoing it may be said a juvenile proceeding under Kansas law is a protective proceeding entirely concerned with the welfare of the child, and is not punitive. The procedures supersede the provisions of the criminal law. The inquiry is directed to the proper care, custody, guidance, control and discipline of the child, and not to his guilt or innocence as a criminal offender. The objectives of a statute creating a juvenile court are designed to provide measures of guidance and rehabilitation for the child and protection for society, and not to fix criminal responsibility, guilt and punishment. For that reason a juvenile proceeding may properly dispense with formal constitutional requirements relating to criminal proceedings.

The United States Supreme Court in the recent case of *Kent v. United States,* 383 U. S. 541, 16 L. Ed. 2d 84, 86 S. Ct. 1045, has clearly recognized the distinction between juvenile proceedings and criminal proceedings by the following language:

"1. The theory of the District's Juvenile Court Act, like that of other jurisdictions, is rooted in social welfare philosophy rather than in the *corpus juris.* Its proceedings are designated as civil rather than criminal. The Juvenile Court is theoretically engaged in determining the needs of the child and of society rather than adjudicating criminal conduct. The objectives are to provide measures of guidance and rehabilitation for the child and protection for society, not to fix criminal responsibility, guilt and punishment. The State is *parens patriae* rather than prosecuting attorney and judge. But the admonition to function in a 'parental' relationship is not an invitation to procedural arbitrariness.

"2. Because the State is supposed to proceed in respect of the child proceeding as *parens patriae* and not as adversary, courts have relied on the premise that the proceedings are 'civil' in nature and not criminal, and have asserted that the child cannot complain of the deprivation of important rights available

in criminal cases. It has been asserted that he can claim only the fundamental due process right to fair treatment. For example, it has been held that he is not entitled to bail; to indictment by grand jury; to a speedy and public trial; to trial by jury; to immunity against self-incrimination; to confrontation of his accusers; and in some jurisdictions (but not in the District of Columbia, see *Shioutakon v. District of Columbia,* 98 U. S. App. D. C. 371, 236 F. 2d 666 [1956], and *Black v. United States, supra* [122 U. S. App. D. C. 393, 355 F. 2d 104]) that he is not entitled to counsel." (pp. 554, 555.)

The trial court, in an effort to reconcile the provisions of Section 6 (*a*) (5) of the act in question, which authorized commitment of boys 16 and 17 years of age adjudged to be delinquent or miscreant to the state industrial reformatory at Hutchinson, Kansas, quoted K. S. A. 76-2320. This statute provides in part:

"The discipline to be observed in said reformatory [state industrial reformatory at Hutchinson] shall be reformatory, and it shall be the duty of said director to maintain such control over all persons committed to his care as shall prevent them from committing crime and best secure their self-support and accomplish their reformation; and to this end said director shall adopt such means of reformation as consistent with the improvement of the inmates as he deems expedient. . . ."

From this statute the trial court concluded the idea and philosophy of the program at the state industrial reformatory was to reform. By reason thereof it held commitment of boys 16 and 17 years of age to the state industrial reformatory fell within the spirit of the Kansas juvenile code, because it was designed for reformation of the child.

In support of the trial court's position the state relies on language in the case of *In re Dunkerton,* 104 Kan. 481, 179 Pac. 347, as follows:

". . . Reformation and education are the primary objects of the [boys] reform school, of the state industrial reformatory, and of the [girls] industrial school. Punishment is incidental only. These institutions are primarily schools, not prisons. . . ." (p. 482.)

The state also relies on a similar expression by the court in *Moffett v. Hudspeth,* 165 Kan. 656, 198 P. 2d 153, where it was said:

"The state industrial reformatory is a corrective institution for youths who may be made useful and law-abiding citizens. (*Martin v. Amrine,* 156 Kan. 384, 387, 133 P. 2d 582.) . . ." (p. 657.)

Despite the provisions of 76-2320, *supra,* and the foregoing language, we hold as a matter of law that *the state industrial reformatory at Hutchinson is a penal institution.* K. S. A. 76-24a01 defines "state penal institutions" to include the *state industrial reformatory* along with the state penitentiary or any other penal institution hereafter established by the state for the confinement of male offenders.

K. S. A. 76-2306 provides that any male person between the ages of 16 and 25 years who shall be convicted for the first time of any offense punishable by confinement in the state penitentiary may, in the discretion of the trial judge, be sentenced either to the state penitentiary or to the *Kansas state industrial reformatory.* K. S. A. 75-20d02 provides that *the state director of penal institutions* shall have the general supervision and management of the state penitentiary, the state industrial farm for women, and *the state industrial reformatory.*

By contrast all the jurisdiction, powers and duties relating to the state industrial school for boys and the state industrial school for girls are conferred upon *the state department of social welfare* by the provisions of K. S. A. 75-3307.

Justice Burch, speaking for the court in *State v. Dubray,* 121 Kan. 886, 250 Pac. 316, said the industrial school acts were based on the principle, then gaining recognition, that the child offender should not be classified as a criminal; that the reformatory act established a penal institution in which young offenders might be segregated, and discipline appropriate to their personalities might be administered. The history of Kansas juvenile court law is reviewed in the opinion.

The director of penal institutions, Mr. McAtee, testified at the hearing in this case that the state industrial reformatory at Huchinson, Kansas, has a high security wall, a perimeter wall, and that in attempting to categorize it as a penologist it would be considered a maximum security facility. It has guards, iron bars, and normal cellhouses with cell guards and guard towers. To a degree it has a solitary confinement section. He further testified that for the past year it has had approximately a daily average inmate population of 900.

By contrast he said both the girls industrial school and the boys industrial school have a very small inmate population, which allows a program to develop which is more individual and more individually directed. There was a difference in staffing in the realm of professionals in the behavioral sciences, psychiatrists, psychologists and psychiatric social workers. At the Kansas industrial reformatory he said they had no one who is a trained professional social worker; that they had classification committee case workers who served the same function, gather the same type of information, and process it into a social history or social summary for each individual, but in the way of a trained social worker they had none.

So long as the proceeding in the juvenile court is in the nature of a protective proceeding entirely concerned with the welfare of the child, and conforms to the substantive requirements of essential due process, there is no constitutional shortcoming. The whole design of the juvenile law is to avoid charging the juvenile offender with crime, thus making inappropriate application of the criminal laws of the state. The breadth of the court's authority to deal with juveniles is matched by a corresponding breadth of responsibility to protect the minor's interests. The validity of the whole juvenile system is dependent upon its adherence to its protective, rather than its penal, aspects. *Dispensing with formal constitutional safeguards can be justified only so long as the proceedings are not, in any sense, criminal.*

We hold confinement in a penal institution will convert the proceedings from juvenile to criminal and require the observance of constitutional safeguards. The noncriminal aspect is the legal backbone of the constitutionality of all American juvenile court legislation. If after a juvenile proceeding, the juvenile can be committed to a place of penal servitude, the entire claim of *parens patriae* becomes a hypocritical mockery. Such action confines a person in a penal institution without having been found guilty of a crime.

On facts before the court in the instant case, the juvenile offender, 16 years of age, had committed a wayward act, not denounced as a crime in Kansas had he been an adult. By reason of previous misconduct he would have been adjudged a miscreant and thereby made eligible for commitment to the state industrial reformatory at Hutchinson, a penal institution. It is thus readily apparent the act in question permits the commitment of a juvenile boy 16 or 17 years of age to a penal institution without ever having committed a crime (either a felony or a misdemeanor) had he been an adult.

The Supreme Court of Vermont in *In re Rich*, 125 Vt. 373, 216 A. 2d 266 (1966), had before it the case of a juvenile offender on appeal in a habeas corpus case. There the juvenile offender was committed to Weeks School for the remainder of his minority by the juvenile court. He was later transferred by executive order of the governor to the House of Correction at Windsor, because he failed to obey the regulations of such school and was not of good deportment. This was said to be a transfer of the juvenile from a detention home to a penal institution, and the court held:

"It is therefore essential to the constitutional validity of our juvenile court procedures that the power to connect it to a punitive proceeding in the criminal

sense be removed. The rehabilitative caretaking offered in exchange for constitutional protections must be substantive and real, not mere verbiage. Otherwise the exchange is, in the words of Professor Paulsen, counterfeit. Paulsen 'Fairness to the Juvenile Offender' supra, 41 Minn. L. R. 547, 576 (1957).

"To this end we hold that any transfer from Weeks School to a penal institution must be founded upon a criminal prosecution and conviction attended by the constitutional guarantees appropriate to such a proceeding. Transfers under the authority of 28 V. S. A. § 415 can constitutionally be made only under such circumstances. This did not occur in this case and must be corrected by a return of the petitioner to Weeks School." (p. 378.)

Under Kansas law a juvenile offender committed to the boys industrial school cannot be transferred to the Kansas state industrial reformatory without a trial in the criminal sense, wherein the offender is charged with a felony and tried as an adult with all of the accompanying constitutional safeguards. (K. S. A. 21-2001; and *Burris v. Board of Administration,* 156 Kan. 600, 134 P. 2d 649.)

For the reasons heretofore assigned, we hold the provision of Section 6 (*a*) (5) of Chapter 278, Laws of 1965, which authorizes the juvenile court to commit a boy 16 years of age or over to the state industrial reformatory, is unconstitutional, and the portion thereof which provides "and if any boy sixteen (16) years of age or over is committed to the state industrial reformatory such commitment shall be subject to the same conditions and rights as would be the case if such commitment were made by a district court" is also unconstitutional.

Our decision is also prompted by the legislative scheme which is made apparent by the enactment of Chapter 278, Laws of 1965. This act did not change or alter K. S. A. 38-801 by which the legislature had previously indicated the underlying theory of the Kansas juvenile code, and the manner in which it should be construed. Other provisions of the act, whereby amendments were made to sections of the code, specifically retained safeguards consistent with the theory of juvenile proceedings as they had previously been construed by the court. There is no indication in the act that the legislature intended to convert proceedings in the juvenile court to criminal proceedings.

Upon striking the invalid portions of Section 6 (*a*) (5) heretofore indicated from the act, many of the arguments advanced by the appellant that the act is unconstitutional in its entirety fall by the way, such as the failure to provide for jury trial, the right to bail, etc., and the unequal treatment of boys and girls.

The appellant contends the grant of discretionary power to the

juvenile court to waive its exclusive original jurisdiction (Section 3 [b]) is contrary to the due process and equal protection guarantees of the United States Constitution, and the Constitution of the state of Kansas, and further constitutes an unlawful delegation of legislative authority to a judicial tribunal contrary to the Constitution of the state of Kansas. On this point the appellant's argument stems from a policy statement made by the advisory council of judges concerning transfer of cases between juvenile and criminal courts. (Vol. 8, Crime and Delinquency, January, 1962.) This study observes the following:

"At first glance previous failure seems a reasonable ground for transfer, but it, too, is in conflict with juvenile court purposes and philosophy, since in effect it means that the court rejects any further attempt to treat the child. Such rejection implies either inadequacy of resources, for which the child is thus made to suffer, or a desire on the part of the court to avoid recording another failure.

.   .   .   .   .   .   .   .   .   .   .   .   .

"3. If the juvenile court feels powerless to help  .  .  .  is the criminal court in a better position?  .  .  .  It has been held that the juvenile court is not justified in transferring a case, no matter how serious, to the criminal court unless the child's own good and the best interests of the state cannot be obtained by retention of jurisdiction.  .  .  .

"4. An illustration of transfer as punishment for a child's attitude came from a study in one state which found that 'three counties engage in the questionable practice of remanding the youth to the criminal court for trial when the youth denies the allegations of the petition.  .  .  .  The threat of certification to the criminal court is also used in some instances to prevent a youth from asserting his rights.' " (pp. 6, 7.)

This court is requested to determine whether the portion of the act in question provides clear standards and guidelines for these waiver decisions to guarantee against abuses and meet the requirements of due process and equal protection, as contained in the Fifth and Fourteenth Amendments to the United States Constitution and the equal protection provisions of the Kansas Constitution.

The argument that no standard is provided ignores the fact that the standard is expressly stated to be whether the child is "amenable to the care, treatment and training program available through the facilities of the juvenile court." To require more precision than this would be impracticable. The factors entering into a juvenile judge's decision on disposition of a child brought before him are many and varied. This was recognized in State v. Doyal, 59 N. M. 454, 286 P. 2d 306 (1955), where a similar attack was made. The

New Mexico waiver provision itself contained no express standard under which the court was to act. However, the Supreme Court held a sufficient standard was provided by the general purposes clause, which stated that the intent of the act was " 'for the rehabilitation and best interest and welfare of the juvenile delinquent.' " (p. 460.) The court rejected an argument that the legislature was required to spell out with particularity the factors best calculated to promote this purpose, saying:

". . . The considerations that might so move a judge are so multifarious, however, that to test validity of legislation by an omission to list them would be almost equivalent to attempting to name all the advantages of being upright and good." (p. 460.)

A similar attack was made in *People v. Shipp*, 59 Cal. 2d 845, 31 Cal. Rptr. 457, 382 P. 2d 577 (1963). The Supreme Court of California held the trial judge was required to exercise his discretion reasonably, in the furtherance of justice, and to serve the purposes of the juvenile court law, and the claim of invalidity was said to be without merit.

The Kansas Supreme Court has previously upheld a statute giving discretion of a similar nature to the juvenile court in the case of *In re Gassaway*, 70 Kan. 695, 79 Pac. 113. There a 13-year-old girl was committed to the industrial school under a statute providing such treatment for any girl " 'who is incorrigible and habitually disregards the commands of her father, mother, or guardian, and who leads a vagrant life, or resorts to immoral places or practices, and neglects or refuses to perform labor suitable to her years and condition, and to attend school.' " (p. 696.) This section was challenged as delegating a legislative task to the judiciary. In rejecting the claim the court stated:

". . . In the determination of the questions the court exercises judicial discretion and judgment, determines from the evidence what would be to the best interest of the state and of the girl, and renders its judgment accordingly. The authority thus exercised is purely judicial, and is not inconsistent with the full and free exercise of the duties imposed upon such courts by the constitution. We have, therefore, a judicial tribunal, created by the constitution, exercising judicial functions conferred by statute." (p. 697.)

The section of the act in question herein requires that substantial evidence be adduced to support a finding that the offense alleged is a felony; that the child was 16 years of age or older at the time of the alleged commission of the offense, and that the child would not be amenable to the care, treatment and training program

available through the facilities of the juvenile court. Considering the nature of the task imposed upon the court, these standards are more than adequate.

A waiver provision similar to that presently under consideration was before the United States Supreme Court under the District of Columbia Juvenile Court Act in *Kent v. United States*, 383 U. S. 541, 16 L. Ed. 2d 84, 86 S. Ct. 1045 (March, 1966). The United States Supreme Court there reviewed the criminal conviction of a 16-year-old boy. Kent had been arrested by the police on charges of breaking and entering and rape. He had previously been adjudged a ward of the juvenile court of the District of Columbia and placed on probation. Prior to the court's consideration concerning the waiver of its exclusive original jurisdiction, counsel for the juvenile moved the court to retain jurisdiction and requested the court to give him access to the social service file relating to the juvenile. The juvenile court did not rule upon these motions and held no hearing. The court simply stated that after "full investigation" it waived jurisdiction over the juvenile, and he was transferred to the district court for the District of Columbia.

Kent appealed the order of the juvenile court waiving jurisdiction, but the order was affirmed. A writ of habeas corpus on the issue was also denied. In the district court the juvenile moved to dismiss the indictment on the grounds that the waiver was invalid, but the court denied this motion to dismiss. Kent was found not guilty by reason of insanity as to the rape charge, but guilty on six counts of house breaking and robbery. He was sentenced to serve 5 to 15 years on each of these six counts, a total of 30 to 90 years' imprisonment. The court of appeals affirmed the conviction, but the United States Supreme Court reversed on the grounds that the juvenile court's waiver was invalid. It held:

"We do not consider whether, on the merits, Kent should have been transferred; but there is no place in our system of law for reaching a result of such tremendous consequences without ceremony—without hearing, without effective assistance of counsel, without a statement of reasons. It is inconceivable that a court of justice dealing with adults, with respect to a similar issue, would proceed in this manner. It would be extraordinary if society's special concern for children, as reflected in the District of Columbia's Juvenile Court Act, permitted this procedure. We hold that it does not." (p. 554.)

Various contentions advanced in the *Kent* case raised problems of substantial concern which were mentioned by the United States Supreme Court but sidestepped. There attention was directed to the petitioner's arguments as to the infirmity of the proceedings by

which the juvenile court waived its otherwise exclusive jurisdiction. The court said:

". . . The issue is the standards to be applied upon such review." (p. 552.) (Emphasis added.)

On this issue the court said in the course of its opinion:

"We agree with the Court of Appeals that the statute contemplates that the Juvenile Court should have considerable latitude within which to determine whether it should retain jurisdiction over a child or—subject to the statutory delimitation—should waive jurisdiction. But this latitude is not complete. At the outset, it assumes procedural regularity sufficient in the particular circumstances to satisfy the basic requirements of due process and fairness, as well as compliance with the statutory requirement of a 'full investigation.' Green v. United States, 113 U. S. App. D. C. 348, 308 F. 2d 303 (1962). The statute gives the Juvenile Court a substantial degree of discretion as to the factual considerations to be considered, the weight to be given them and the conclusion to be reached. It does not confer upon the Juvenile Court a license for arbitrary procedure. The statute does not permit the Juvenile Court to determine in isolation and without the participation or any representation of the child the 'critically important' question whether a child will be deprived of the special protections and provisions of the Juvenile Court Act. It does not authorize the Juvenile Court, in total disregard of a motion for hearing filed by counsel, and without any hearing or statement or reasons, to decide—as in this case—that the child will be taken from the Receiving Home for Children and transferred to jail along with adults; and that he will be exposed to the possibility of a death sentence instead of treatment for a maximum, in Kent's case, of five years, until he is 21." (pp. 552-554.)

In its decision the United States Supreme Court quoted and referred approvingly to *Black v. United States, 122 U. S. App. D. C. 393, 355 F. 2d 104*, decided by the court of appeals for the District of Columbia on December 8, 1965, which held that *assistance of counsel in the "critically important" determination of waiver is essential to the proper administration of juvenile proceedings, and that the need is even greater in the adjudication of waiver than was the assistance of counsel in juvenile court proceedings, since it contemplated the imposition of criminal sanctions.*

In speaking of the determination of whether to transfer a child from the statutory structure of the juvenile court to the criminal processes of the district court, the United States Supreme Court said:

". . . We hold that it is, indeed, a 'critically important' proceeding. The Juvenile Court Act confers upon the child a right to avail himself of that court's 'exclusive' jurisdiction. As the Court of Appeals has said, '[I]t is implicit in [the Juvenile Court] scheme that non-criminal treatment is to be the rule—and the adult criminal treatment, the exception which must be governed by the particular factors of individual cases.' Harling v. United States, 111 U. S. App. D. C. 174, 177-178, 295 F. 2d 161, 164-165 (1961).

"Meaningful review requires that the reviewing court should review. It should not be remitted to assumptions. It must have before it a statement of the reasons motivating the waiver including, of course, a statement of the relevant facts. It may not 'assume' that there are adequate reasons, nor may it merely assume that 'full investigation' has been made. Accordingly, we hold that it is incumbent upon the Juvenile Court to accompany its waiver order with a statement of the reasons or considerations therefor. We do not read the statute as requiring that this statement must be formal or that it should necessarily include conventional findings of fact. But the statement should be sufficient to demonstrate that the statutory requirement of 'full investigation' has been met; and that the question has received the careful consideration of the Juvenile Court; and it must set forth the basis for the order with sufficient specificity to permit meaningful review." (pp. 560, 561.)

Accordingly, we hold the provisions of Section 3 (*b*) of the act in question are not unconstitutional for any of the reasons asserted by the appellant, and the standards to be applied in adjudicating waiver proceedings are adequate when applied in accordance with the requirements set forth in *Kent v. United States*, supra.

The appellant's argument, that the act in question is ambiguous and discriminatory in its provisions to the extent that it cannot be uniformly applied nor interpreted in a clear and concise manner, in view of the foregoing discussion, is so nebulous that we think it merits no attention as a challenge directed to the constitutional validity of the act in question.

The remaining question is whether, having declared the provisions of the act authorizing commitment to the state industrial reformatory at Hutchinson unconstitutional, these provisions are severable from the other provisions in the act.

The appellant contends where an act contains no severability clause and is found to be unconstitutional in part, and all parts of the act are so related that the unconstitutional parts are a condition of, a compensation for, or an inducement to the constitutional part, or where it is obvious the legislature would not have enacted one but for the other, then the unconstitutional parts invalidate the entire statute.

It is argued the sole purpose of the legislature in passing the act in question was to extend juvenile jurisdiction over male persons 16 and 17 years of age, but as a consideration for this change in jurisdiction, Section 3 (*b*) was enacted providing for waiver of jurisdiction by the juvenile court, and Section 6 (*a*) (5), (a portion of which we have found to be unconstitutional) was enacted. Without these two provisions, it is contended, the legislature would not

have passed the act in question extending the juvenile court's jurisdiction.

While the legislature may not have contemplated the burden it imposed upon the juvenile courts of Kansas, first, by conferring upon them original exclusive jurisdiction over all boys 16 and 17 years of age, and second, by authorizing the juvenile court to waive its original jurisdiction in accordance with the provisions of Section 3 (*b*), considered in the light of *Kent v. United States*, supra, the entire act is not unconstitutional for this reason.

The general doctrine is that only the invalid parts of a statute are without legal efficacy. This is qualified by the further rule that if the void and valid parts of the statute are so connected with each other in the general scheme of the act that they cannot be separated without violence to the evident intent of the legislature, the whole must fall. (*State v. Smiley*, 65 Kan. 240, 69 Pac. 199.)

In *State, ex rel., v. Wyandotte County Comm'rs*, 140 Kan. 744, 39 P. 2d 286, this court said:

". . . Frequently the court can say with assurance that if the legislature had been apprised of the invalidity of some incidental feature of a legislative measure, it would have eliminated it and would have enacted the measure nevertheless. In such situations it becomes a judicial question to discover, if practicable, the paramount legislative intent. . . ." (pp. 750, 751.)

The majority of the members of this court think the invalid portions of the act in question, authorizing commitment to the state industrial reformatory, are severable from the remainder of the act and will not do violence to the evident intent of the legislature; that the paramount intent of the 1965 legislature in enacting Chapter 278 was to extend the jurisdiction of the juvenile court to include 16 and 17-year-old males, and to give it the power to decide whether the particular child is amenable to juvenile court treatment or should be referred to the criminal courts.

The provision for commitment to the state industrial reformatory at Hutchinson is merely one authorized disposition among many possible dispositions for males adjudicated miscreant or delinquent. That commitment to the Kansas state industrial reformatory at Hutchinson is not an essential part of the juvenile court's extended jurisdiction under the act is illustrated most strikingly by the testimony of the appellant in this case. He testified that the Kansas Probate Judges' Association decided early not to use this provision of the act. These judges obviously felt the act could be effectively administered without the provision for commitment to the Kansas state industrial reformatory.

Accordingly, the order of mandamus issued by the lower court commanding the appellant to forthwith assume jurisdiction in all proceedings concerning the person of a child 16 or 17 years of age who appears to be delinquent, miscreant or wayward, as defined in the Laws of 1965, Chapter 278, Sections 1 to 9, is affirmed to the extent that the act in question is held to be constitutional, but reversed as to the portion thereof which is held to be unconstitutional and invalid.

Schroeder, J., dissenting: I must respectfully dissent from that portion of the opinion written for the court holding the invalid portion of Chapter 278, Laws of 1965, separable from the remainder of the act.

The legislature was fully aware that the facilities of the state for handling juvenile offenders was limited. This is indicated by the provisions of Section 6 (*a*) (5), which read:

"(5) commit such child, if a boy under the age of sixteen (16), to the state industrial school for boys, *or if a boy sixteen (16) years of age or over to* [either] *the state industrial school for boys,* [or the state industrial reformatory:] *Provided, No boy sixteen (16) years of age or over shall be committed to the state industrial school for boys unles such commitment has received the prior approval of the director of the division of institutional management,* [and if any boy sixteen (16) years of age or over is committed to the state industrial reformatory such commitment shall be subject to the same conditions and rights as would be the case if such commitment were made by a district court;] . . ." (Emphasis added.)

The new provisions of this subsection are emphasized, and those held invalid are set apart in brackets.

By providing that no boy 16 years of age or over shall be committed to the state industrial school for boys unless such commitment has received the prior approval of the director of the division of industrial management, the legislature froze commitments to that institution in keeping with the facilities available at that institution. Evidence in the record discloses that the state industrial school for boys will be capable of taking not more than 20 or 30 boys per year in the 16 and 17 year age group for the entire state of Kansas.

K. S. A. 76-2110 provides:

"Whenever there shall be as large a number of boys in the school as can properly be accommodated, it shall be the duty of the department of social welfare to give notice to the courts of the fact by publication in some daily paper of general circulation published at the capital of the state, whereupon no boys shall be sent to the school by the said courts until notice shall be given them by the department of social welfare as aforesaid that more can be received."

Reports issued monthly by the Kansas Bureau of Investigation disclose that there are approximately 350 to 400 offenders per month in the state of Kansas 16 and 17 years of age. For the month of March, 1966, there were 455.

The appellant testified that in 1965 there were 826 boys 16 and 17 years of age arrested in Sedgwick County for felonies and misdemeanors, not counting traffic offenses.

It was abundantly clear to the legislature that some outlet for the extension of jurisdiction of the juvenile courts to include the 16 and 17-year-old male offenders had to be provided. It therefore designated the Kansas state industrial reformatory as a place for the commitment of these offenders. Little did it suspect this portion of the act would be declared unconstitutional, and little did it suspect the *original exclusive jurisdiction* foisted upon the juvenile court would obligate the juvenile court to conduct the full dress hearings required by *Kent v. United States*, 383 U. S. 541, 16 L. Ed. 2d 84, 86 S. Ct. 1045, to waive such jurisdiction.

In my opinion, the legislature would not have enacted the act in question had it known the portion authorizing commitment to the state industrial reformatory at Hutchinson was invalid.

The burden cast upon the probate judges of the state, who are by statute made the judges of the juvenile courts of their respective counties (K. S. A. 38-804) will be intolerable, particularly in the greater populated counties. Nowhere was any appropriation for additional money made to cover the expense of such extended jurisdiction and resultant litigation. (See, 6 Kan. L. Rev. 347, 349.)

Throughout the history of our state the legislature has had an eye on economy in resolving litigation. For example, see K. S. A. 60-102. The legislature obviously did not contemplate the tremendous expense which is being imposed upon juvenile courts to waive the original exclusive jurisdiction conferred upon them over 16 and 17-year-old male offenders who were previously handled in the criminal courts, where the facilities had become established and the procedures tested.

Under *Kent* the juvenile court is confronted with a critically important proceeding, if its original exclusive jurisdiction is to be waived and the offender is to be prosecuted in the criminal courts. The juvenile offender is entitled to counsel, and whether the requirement of K. S. A. 1965 Supp. 38-821, that a guardian *ad litem* be appointed, will fulfill this requirement remains to be seen. He is not only entitled to counsel, but must be informed of his rights

to counsel. The juvenile court must accompany its waiver order with a statement of reasons or consideration therefor. The statement must be sufficient to demonstrate that the statutory requirements of Section 3 (*b*) have been met; that the question has received the careful consideration of the juvenile court; *and it must set forth the basis for the order with sufficient specificity to permit meaningful review.*

Not only this but consider further requirements imposed by the United States Supreme Court where a waiver hearing is conducted. In *Kent* it was said:

"With respect to access by the child's counsel to the social records of the child, we deem it obvious that since these are to be considered by the Juvenile Court in making its decisions to waiver, they must be made available to the child's counsel. This is what the Court of Appeals itself held in *Watkins.* [*Watkins v. United States,* 119 U. S. App. D. C. 409, 343 F. 2d 278 (1964)]. There is no doubt as to the statutory basis for this conclusion, as the Court of Appeals pointed out in *Watkins.* We cannot agree with the Court of Appeals in the present case that the statute is 'ambiguous.' The statute expressly provides that the record shall be withheld from 'indiscriminate' public inspection, 'except that such records or parts thereof *shall* be made available by rule of court or special order of court to such persons . . . as have a *legitimate interest* in the protection . . . of the child. . . .' D. C. Code §11-929 (b) (1961), now § 11-1586 (b) (Supp. IV, 1965). (Emphasis supplied.) The Court of Appeals has held in *Black* [*Black v. United States,* 122 U. S. App. D. C. 393, 355 F. 2d 104 (1965)] and we agree, that counsel must be afforded to the child in waiver proceedings. Counsel, therefore, have a 'legitimate interest' in the protection of the child, and must be afforded access to these records.

"We do not agree with the Court of Appeals' statement, attempting to justify denial of access to these records, that counsel's role is limited to presenting 'to the court anything on behalf of the child which might help the court in arriving at a decision; it is not to denigrate the staff's submissions and recommendations.' On the contrary, if the staff's submissions include materials which are susceptible to challenge or impeachment, it is precisely the role of counsel to 'denigrate' such matter. There is no irrebuttable presumption of accuracy attached to staff reports. If a decision on waiver is 'critically important' it is equally of 'critical importance' that the material submitted to the judge—which is protected by the statute only against 'indiscriminate' inspection—be subjected, within reasonable limits having regard to the theory of the Juvenile Court Act, to examination, criticism and refutation. While the Juvenile Court judge may, of course, receive *ex parte* analyses and recommendations from his staff, he may not, for purposes of a decision on waiver, receive and rely upon secret information, whether emanating from its staff or otherwise. The Juvenile Court is governed in this respect by the established principles which control courts and quasi-judicial agencies of the Government." (pp. 562, 563.)

The waiver proceeding necessarily contemplates review in the appellate courts, and the burdensome expenses upon the taxpayers to pay the bill follow just as night follows day. (See, *State v. Dubray*, 121 Kan. 886, 250 Pac. 316.)

The waiver provision in Section 3 (*b*) of the act is new to the Kansas juvenile code, and the expense will also be new and additionally burdensome, particularly with the provisions of the act designed by the legislature as an outlet—commitment of 16 and 17-year-old male offenders to the Kansas state industrial reformatory —declared invalid. Failure of adequate facilities to cope with the problem will undoubtedly lead the juvenile courts to resort to waiver proceedings.

The act as it now stands thwarts the very purpose of the Kansas juvenile code as expressed in K. S. A. 38-801, because the state cannot exercise its parental power where it lacks proper facilities to provide for the juveniles.

I am confident the legislature would not have enacted Chapter 278, Laws of 1965, had it known the portion declared invalid was unconstitutional. Accordingly, it is respectfully submitted the entire act should be declared unconstitutional because the portion declared invalid is inextricably tied to the whole enactment. .

FATZER, J., concurring and dissenting: I do not find the issues of this case as simple and straightforward as does the court. For me, the record is not susceptible to the reading given it. The court has proceeded to declare portions of the 1966 juvenile code (L. 1965, Chs. 278, 279, 280, effective January 1, 1966) unconstitutional purely upon the *assumption* that some of the questions decided are presented in the record. I would rest the decision of this case solely on the basis that the judge of the juvenile court of Sedgwick County had jurisdiction of the alleged wayward child it discharged and direct that it assume jurisdiction of all alleged juvenile offenders sixteen and seventeen years of age and dispose of their cases in accordance with the juvenile code as the facts and circumstances warrant. I cannot agree the court should here go further and strike down the provisions of K. S. A. 38-826 (*a*) (5) upon the grounds that the commitment of sixteen and seventeen-year-old youths to the Kansas State Industrial Reformatory is unconstitutional. As hereafter indicated, the question is simply not before the court for consideration.

It is unnecessary to further detail the progressive and humani-

tarian purpose of the Kansas juvenile code. That has been done in the court's opinion and in the decisions of this court which are cited. The revised juvenile code which went into effect on July 1, 1957 (L. 1957, Ch. 256 [K. S. A. 38-801—38-838]) carries out the philosophy that an act committed by a juvenile, no matter what the act might be, is not considered a crime, but a juvenile offense. This philosophy has been a conscientious state policy of long standing, and the Kansas juvenile code is considered by many states as a model code for dealing with juvenile offenders.

The 1966 juvenile code here considered amended eleven sections of the 1957 juvenile code: K. S. A. 38-802; 806; 808; 815; 816; 819; 821; 824; 826; 828 and 836, and among other things, extended the jurisdiction of the juvenile court to include sixteen and seventeen-year-old boys. As quoted in the court's opinion, 38-826 (a) (5) provides that a child adjudged to be a delinquent or a miscreant child, if such child is a boy sixteen years of age or over, may be ordered committed to the Kansas State Industrial Reformatory by the judge of the juvenile court, and such commitment "shall be subject to the same conditions and rights as would be the case if such commitment were made by a district court . . ."

I am in accord with the court's opinion the juvenile court of Sedgwick County had exclusive original jurisdiction of the sixteen-year-old alleged wayward child and it erred in discharging him and it also erred in refusing to assume jurisdiction of the person of a child sixteen or seventeen years of age who was alleged to be delinquent, miscreant or wayward as defined in 38-802. It is clearly within the power of the legislature to classify persons by age for the purpose of dealing with them as delinquents, miscreants or as wayward children. The fact that the legislature deemed it proper to increase the jurisdiction of the juvenile court over male youths from sixteen years of age to those under eighteen years cannot be questioned by a juvenile court, nor afford a judge of that court valid reasons to deny jurisdiction of youthful offenders falling within that age classification.

Our Bill of Rights, including Section 2, which has been held to be the equivalent of the due process and equal protection clauses of the Fourteenth Amendment (*Tri-State Hotel Co. v. Londerholm,* 195 Kan. 748, 408 P. 2d 877, Syl. ¶ 1, and cases cited), is designed, among other things, to secure to our citizens certain "rights" which at times had formerly been denied them, and it does not follow that the state is not concerned with them, yet such rights are personal

in nature and must be asserted *by the individual* who claims their violation. This is so fundamental in our judicial process as to require no citation of authority.

Basically, my objection to the court's sweeping decision striking down portions of 38-806 (*a*) (5) is twofold. First, as applied to the 1966 amendments, the precise nature of the "rights" of juvenile male offenders allegedly involved in this case are not clear. In fact, they do not exist. There is no delinquent or miscreant child's personal or constitutional rights before this court for adjudication. The only youthful offender *to which the act might have been applied* was discharged by the judge of the juvenile court of Sedgwick County. That court has not assumed jurisdiction of any alleged juvenile offenders, and no delinquent or miscreant child has been committed to the Kansas State Industrial Reformatory. In speculating upon the alleged wayward child's case when he discharged him, the judge of the juvenile court said:

". . . If this case were to proceed to hearing and after hearing the evidence the Court found this boy to actually have committed this act of glue sniffing and were to adjudicate him wayward, it would be this boy's third wayward adjudication, and he *would in all probability* be adjudicated a miscreant child, and *could* be committed to the State Industrial Reformatory . . ." (Emphasis supplied.)

The record indicates that the judge of the juvenile court voted against use of the so-called "reformatory section" of the 1966 amendments at the Kansas Probate Judge's Association, and he testified in this case he would not use that section to commit juvenile offenders to the Kansas State Industrial Reformatory when rendering judgment in a juvenile court case. Nonetheless, based upon this conjecture, the court has stated the wayward youth ". . . would have been adjudged a miscreant and thereby made eligible for commitment to the state industrial reformatory at Hutchinson, a penal institution." Acting purely upon this *assumption* the court declared that portion of 38-826 (*a*) (5) indicated in the opinion, to be unconstitutional. In the recent case of *Kent v. United States,* 383 U. S. 541, 16 L. Ed. 2d 84, 86 S. Ct. 1045, the Supreme Court of the United States said "[M]eaningful review requires that the reviewing court . . . should not be remitted to assumptions . . ." I concur in that view. It is a long-standing rule of constitutional law that courts will not refuse to pass on the constitutionality of statutes in any proceeding in which such determination is necessarily involved, but unnecessary considerations of attacks on their validity will be avoided *and courts will not pass upon constitutional*

*questions not duly raised and insisted upon since they are not properly before it.* (*State, ex rel., v. Fadely,* 180 Kan. 652, 308 P. 2d 537, and cases cited.) No substantial claims of constitutional violation is properly raised or presented, and it is clear to me the judge of the juvenile court may not advance constitutional claims for an alleged wayward child based solely upon conjecture of what his findings or judgment *might have been* had he not discharged the child from his court's jurisdiction.

We can rightly expect the juvenile code will be applied under many and varied conditions, but until it is *actually applied* this court is purely "guessing" on what questions will arise and under what facts and circumstances they will be presented. To illustrate, had the judge of the juvenile court assumed jurisdiction of the alleged wayward child and found from the evidence and records of the court he was a miscreant child and ordered him committed to the Kansas State Industrial Reformatory, the miscreant child could allege that, in a habeas corpus proceeding, his civil right of personal liberty was infringed and present specific questions by which this court could measure his constitutional rights under Section 2 of our Bill of Rights. It goes without saying this court should not "assume" in some fanciful case, that constitutional rights have been or will be violated by the judge of a juvenile court in dealing with juvenile offenders. Assuming that, as the court holds, the Kansas State Industrial Reformatory is a penal institution, a commitment of a delinquent or miscreant child to that reformatory might, under circumstances not here presented, be held to be unconstitutional, and under other circumstances be held to be lawful and proper, as hereafter detailed. However, based upon the assumptions heretofore noted, the court's opinion gives us no chance to pass upon the validity of the commitment of a sixteen or seventeen-year-old delinquent youth whose case has been referred to the district court where he is charged with a felony and given all the essential constitutional rights of an adult charged with crime, and when found guilty by a jury as being a delinquent child as defined in 38-802, he is remanded back to the juvenile court for judgment and sentence as provided in the act.

Second, the court proceeds to strike down 38-826 (*a*) (5) upon the ground a sixteen or seventeen-year-old delinquent or miscreant child may not be confined in the Kansas State Industrial Reformatory without a trial by a jury in the criminal sense wherein the youthful offender is tried as an adult with all the accompanying essential

constitutional safeguards. In the words of the court "confinement in a penal institution will convert the proceedings from juvenile to criminal and require the observance of constitutional safeguards," (p. 223) and that "the provision of Section 6 (*a*) (5) of Chapter 278, Laws of 1965, [K. S. A. 38-826 (*a*) (5)] which authorizes the juvenile court to commit a boy 16 years of age or over to the state industrial reformatory, is unconstitutional, and the portion thereof which provides 'and if any boy sixteen (16) years of age or over is committed to the state industrial reformatory such commitment shall be subject to the same conditions and rights as would be the case if such commitment were made by a district court' is also unconstitutional." (p. 224.)

In my opinion, the court does not have this question before it. When current criminal statistics of the state are brought into proper focus, the impact of the court's sweeping decision becomes readily apparent. The Kansas Bureau of Investigation is the only statewide agency which compiles a record of crimes committed in the state and the age of the persons committing them. The police departments of the cities, the sheriffs' offices of the counties, and the State Highway Patrol make monthly reports of this information to the Kansas Bureau of Investigation. These records indicate that in 1965 there were 11,592 crimes committed by persons under eighteen years of age and that 3,982 of those youthful offenders were referred to juvenile courts or to probation departments. Most important is the astounding fact that these records show *more crimes are being committed, with respect to burglary, larceny, auto theft and arson, and perhaps other crimes, by offenders under eighteen years of age than by all persons over eighteen years of age.* The same trend is established for the first three months of 1966. This is impressive evidence. The record indicates that the present facilities of the boys industrial school are wholly inadequate to rehabilitate youthful offenders of this number, and the legislature clearly intended that the facilities of the Kansas State Industrial Reformatory should be used to reform persistent offenders of this age group.

The jurisdiction to determine the preliminary question, which the court holds to be "critically important" as detailed in the opinion, whether an alleged delinquent child shall be proceeded against as a criminal or as a delinquent, pursuant to 38-808, resides exclusively in the juvenile court and this court should not assume those provisions will be ignored by the judges of the juvenile courts,

or in view of the foregoing criminal statistics, that they will not be consistently applied. Hence, I ask, what is the status of a delinquent offender less than eighteen years of age who violates a criminal statute, which if done by a person eighteen years of age or over, would make him liable to be arrested and prosecuted for the commission of a felony, and is referred by a proper order to the district court pursuant to 38-808, and charged, tried and convicted of committing a felony, with all the essential constitutional safeguards afforded an adult offender, and the jury's verdict is that the child is a delinquent child as defined in 38-802, and he is remanded to the juvenile court for judgment and sentence? Can it be contended the provisions of 38-826 (a) (5) are unconstitutional because the juvenile court, not the district court, orders him committed to the Kansas State Industrial Reformatory? The court's decision holds the commitment of such delinquent youth is unconstitutional. I do not agree.

Prior to the enactment of the 1966 amendments, a male offender sixteen or seventeen years of age, under the same facts and circumstances, that is, charged, tried and convicted of a felony with all essential constitutional safeguards in the district court, could be lawfully committed by that court to the Kansas State Industrial Reformatory pursuant to K. S. A. 76-2306 which reads:

"Any male person between the ages of sixteen (16) and twenty-five (25) who shall be convicted for the first time of any offense punishable by confinement in the state penitentiary may, in the discretion of the trial judge, be sentenced either to the state penitentiary or to the Kansas state industrial reformatory."

In the recent case of *State v. Crow*, 196 Kan. 663, 414 P. 2d 54, this court construed and applied the statute and no one has ever entertained the thought that the confinement of a sixteen or seventeen-year-old youth in the reformatory under such circumstances was unconstitutional.

Under the 1966 amendments to the juvenile code, the jurisdiction of sixteen and seventeen-year-old male juvenile offenders committing felonies has been removed from the district courts and the juvenile courts now have exclusive original jurisdiction. But the court's opinion makes it impossible for a juvenile court to confine them in the Kansas State Industrial Reformatory under circumstances where they have been properly referred to the district court pursuant to 38-808, tried by a jury with all accompanying constitutional safeguards, found to be delinquent as defined in the act, and remanded to the juvenile court for sentence.

As indicated, the court has passed upon constitutional questions in this case which are not presented, but are only *assumed* to exist. In no event, however, should it strike down the provisions of 38-826 (*a*) (5) with respect to confinement in the Kansas State Industrial Reformatory *in toto*. It is a well-established rule in this jurisdiction that it is the court's duty to uphold legislation rather than defeat it, and if there is any reasonable way to construe legislation as constitutionally valid, that should be done. (*Marks v. Frantz,* 179 Kan. 638, 298 P. 2d 316.) The court starts at the threshold of the inquiry of validity of a statute with the presumption the legislature intended to enact a valid law and to enact it for the accomplishment of a needful purpose. (*State, ex rel., v. Board of Education,* 137 Kan. 451, 453, 21 P. 2d 295.) Since the court persists in considering the constitutional validity of 38-826 (*a*) (5), the section could well be construed to apply only to cases of male offenders over sixteen years of age where they have been referred to the district court pursuant to 38-808 and are tried and convicted by a jury of the commission of a felony, with all the accompanying constitutional safeguards, and remanded to the juvenile court for judgment and sentence. Such a construction would be consistent with the language of the section that a commitment ". . . shall be subject to the same *conditions* and *rights* as would be the case *if such commitment were made by a district court* . . ." (Emphasis supplied.) It would seem logical to suggest the legislature's use of the words "conditions," "rights" and "made by a district court" were intended to refer to proceedings in the district court where a delinquent offender was afforded all constitutional safeguards and his guilt was determined by a jury.

Again, I reiterate all of the questions decided by the court in this case are not before it for decision, except that the judge of the juvenile court of Sedgwick County has exclusive original jurisdiction over sixteen and seventeen-year-old male offenders who are alleged to be delinquent, miscreant or wayward as defined in the act and to dispose of their cases in accordance with the juvenile code. When the court decided that question it should have concluded its opinion. I would enter judgment sustaining the 1966 amendments to the juvenile code in conformity with the views herein expressed.