No. 48,379

# In the Interest of MICHAEL A. FERRIS

(563 P.2d 1046)

Opinion filed April 9, 1977.

*Kenneth M. Carpenter,* of Topeka, argued the cause, and was on the brief for the appellant.

*Frank Yeoman, Jr.,* assistant district attorney, argued the cause, and *Curt T. Schneider,* attorney general, and *Gene M. Olander,* district attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is an appeal from the trial court's order declaring Michael Ferris, age seventeen, not amenable to the care, treatment and training program available through the facilities of the juvenile court (K.S.A. 1975 Supp. 38-808 [*b*] [now K.S.A. 1976 Supp. 38-808 (*b*)]), subjecting him to prosecution as an adult for two counts of aggravated battery against a law enforcement officer (K.S.A. 21-3415), one count of felony theft (K.S.A. 21-3701), one count of attempted aggravated escape (K.S.A. 21-3301 and K.S.A. 21-3810) and one count of obstructing legal process (felony) (K.S.A. 21-3808).

The appellant raises various constitutional and evidentiary arguments concerning his certification as an adult. The appellant also raises arguments on the admission of evidence concerning civil commitment in a hearing to determine waiver of juvenile jurisdiction. The appellant argues mental illness is a sufficient basis for retaining jurisdiction by the juvenile court, where the juvenile can be dealt with under the civil mental illness statutes.

Michael Ferris was born March 7, 1958. His family consists of his mother, father and eight older brothers, some of whom are actually half-siblings. Michael lives with his parents in his hometown of Scranton in Osage County, Kansas.

Michael has run afoul of the law for many years. He began breaking and entering neighbors' homes for liquor to drink when he was nine years old. He has used valium, barbiturates and LSD since he was thirteen.

On March 27, 1972, Michael, then thirteen years of age, was

adjudicated a delinquent child in the juvenile court of Osage County for two counts of burglary. (K.S.A. 21-3715.) As a result, Michael was committed to the Atchison Youth Rehabilitation Center, where he twice ran away from his group for short periods of time. He was subsequently paroled to his parents subject to supervision by the Osage County Social Welfare Department. Two years after adjudication he was discharged. Shortly thereafter, on April 29, 1974, Michael was diverted from prosecution and further court process in regard to five counts of felony theft. There is also evidence of Michael spending some time at the Kansas Children's Receiving Hospital following an incident in which he threatened a school teacher in Scranton, Kansas, with a pair of brass knuckles.

Michael's conversations with Charles Pachella, a psychologist for the Shawnee County Court Services, also revealed other problems which did not involve the juvenile authorities. Michael spoke of taking an ax to his car, wrecking a friend's car so that they would collect the insurance, beating his sister-in-law and pointing a loaded pistol at his sister-in-law and threatening to shoot her.

There is substantial evidence that Michael has a drug problem. Doctor James B. Horne, a psychiatrist and clinical director of the Shawnee County Court Services, testified as follows:

".  .  . He has used valium, barbiturates and LSD since he was 13. He has the most thoroughgoing drug orientation of any patient I have ever examined. He states that he only feels normal when he is on drugs and he feels strange when he is not. His whole orientation is toward the maintenance of a high on drugs.  .  .  ."

When under the influence of drugs, Michael becomes violent, destroys property and threatens others. In fact Dr. Horne characterized Michael as psychotic when on drugs, but not otherwise.

Dr. Horne further believes Michael is suffering from an acute organic brain syndrome, an impairment of brain functioning due to dead brain cells possibly caused by the tremendous doses of sedatives and alcohol over an unusually prolonged period of time. Psychological testing reveals Michael possesses an I.Q. of 84 and is classified as dull normal.

Relevant to the case at bar, the state alleged that on August 16, 1975, Michael, then seventeen years and five months, committed the five acts of delinquency enumerated above in Shawnee

County, Kansas. All of the offenses alleged would be felonies if committed by adults.

It appears Michael was a passenger in a vehicle with one other juvenile and one adult which was traveling in violation of the traffic code. Although unknown to two Topeka police officers pursuing them at that time, the vehicle had been involved as the "get away vehicle" in a purse snatching incident earlier. After being apprehended, Michael attempted to escape from custody. Although handcuffed, Michael was able to secure the gun of one of the officers which he fired several times, striking both officers. The record reveals Michael was under the influence of drugs at this time.

On August 18, 1975, the state initiated proceedings asking the juvenile court of Shawnee County to waive its original and exclusive jurisdiction and to direct that Michael be prosecuted as an adult. A guardian *ad litem* was appointed and evidence heard. After hearing the evidence, the juvenile court of Shawnee County waived its jurisdiction and directed that Michael be prosecuted as an adult. An appeal was taken from that decision to the district court of Shawnee County which conducted an extensive *de novo* hearing on December 19, 1975.

In the district court, Dr. Horne, who twice examined Michael, testified that Michael was unaware of other people's feelings and had no inhibition to hurting them. He further testified:

". . . He has very little self control. He has not practiced at all to develop any kind of self control, therefore, he responds to impulses almost immediately. Further, his total orientation is to staying high on drugs; and with him drugs are not really sedatives but actually facilitate impulsive action. *I would have to conclude that he is very dangerous.* . . ." (Emphasis added.)

Dr. Horne said it might take three to five years or more to cure Michael. Even then the chances for successful treatment would be 50/50.

Dr. Horne, who was familiar with various juvenile programs, said the AWL Unit at the Topeka State Hospital was the likeliest to provide the necessary treatment although it was a short-term program. Dr. Horne said that the Youth Center at Topeka (formerly the Boys' Industrial School) would be inappropriate because of Michael's age and the Larned facilities would not serve Michael's needs. Dr. Horne concluded:

". . . If you ask me is there a facility in the state that is designed and willing and ready and able to treat this boy, there isn't one."

Charles Pachella testified:

"The only juvenile placement that I could think of that would provide the security and the treatment that Mike could profit from would be the AWL Unit from Topeka State in terms of juveniles."

Michael Patterson, probation officer for the Shawnee County Court Services, juvenile division, testified it was his opinion there aren't any juvenile institutions that could meet Michael's needs.

Dr. Robert A. Haines, Director of the Division of Mental Health and Retardation Services, Department of Social and Rehabilitation Services of Kansas, discussed the Osawatomie Youth Rehabilitation Units which are designed for three to six months rehabilitation. He also discussed the Topeka State Hospital and Larned. Dr. Haines testified his department had control over civil commitments to mental institutions from the probate courts. When Dr. Haines was asked if there were facilities available through civil commitment for individuals who were twenty-one years of age or over, the court sustained an objection to the question because it called for a legal conclusion and because the test is whether or not Michael would be amenable so far as the facilities of the juvenile court were concerned, not whether there are other courts which have facilities.

The district court also considered evidence from Vicki Haley, a social worker for the Kansas Department of Social and Rehabilitation Services, and Floyd Sappington, the Superintendent of the Atchison Youth Rehabilitation Center. Admitted in evidence by stipulation were the certified copies of the records of the juvenile court of Osage County, the social history prepared by Roberta Scott, a social worker, progress reports prepared by Joseph Evans, a psychologist, a psychological evaluation prepared by Howard Snowbarger, a psychologist, and an intake summary prepared by Ellen Cameron, a social worker.

Based on the massive and detailed information, the district court found:

"(3) The seriousness of the alleged offenses is so great that the protection of the community requires waiver.

"(4) The alleged offense of aggravated battery against a law enforcement officer was committed in an aggressive and willful manner.

"(5) After considering the home, the environment, the emotional attitude and

pattern of living of respondent as well as his maturity and emotional develop-
ment, the Court finds there is little likelihood of reasonable rehabilitation of
respondent by the use of procedures, services and facilities currently available to
the Juvenile Court.

"(6) The record and previous history of the respondent indicate a continued
trend toward drug addiction, violence and antisocial behavior.

"(7) The respondent is not amenable to the care, treatment and training
program available through facilities of the Juvenile Court for the following
reasons:

    (a) his long standing multiple drug addiction;

    (b) his propensity for violent and aggressive conduct;

    (c) his need for long term treatment (i.e. 3 to 5 years in a secure psychiatric
        institution);

    (d) his poor prognosis even if given recommended treatment;

    (e) his present age of 17 years, 10 months, in view of the jurisdictional
        limitation of the Juvenile Court with respect to respondent's age; and

    (f) his previous record which indicates respondent was not amenable to the
        care, treatment and training program available through the facilities of the
        Juvenile Court of Osage County."

On December 19, 1975, the district court waived juvenile court
jurisdiction for the August 16, 1975, acts and all future allegations
of delinquency or miscreancy. Following an unsuccessful motion
to reconsider, appeal from the district court's order was duly
perfected.

Before examining the appellant's three contentions, it must be
recognized this court has examined the criteria for certifying a
juvenile as an adult on many occasions. (*State, ex rel., v. Owens,*
197 Kan. 212, 416 P.2d 259; *In re Templeton,* 202 Kan. 89, 447
P.2d 158; *In re Stephenson & Hudson,* 204 Kan. 80, 460 P.2d 442;
*In re Patterson, Payne & Dyer,* 210 Kan. 245, 499 P.2d 1131; *State
v. Shepherd,* 213 Kan. 498, 516 P.2d 945; *State v. Green,* 218 Kan.
438, 544 P.2d 356; *In re Harris,* 218 Kan. 625, 544 P.2d 1403; and
*State v. Lewis,* 220 Kan. 791, 556 P.2d 888.)

In *State, ex rel., v. Owens,* supra at 225, it was noted the
juvenile code expressly provided a standard for certification. The
test was whether the child is "amenable to the care, treatment and
training program available through the facilities of the juvenile
court." Subsequent cases have elaborated on the factors the
district court was required to examine in determining a juvenile's
amenability to treatment. Among the applicable factors pre-
viously considered are: (1) social records or staff reports; (2) prior
juvenile files showing unsuccessful efforts at rehabilitation; (3)
the nature of a juvenile's prior delinquency, the date or dates and

the success or failure of probation, if applicable; (4) the cause, nature and result of counseling with the juvenile; (5) evidence of persistent prior misconduct; (6) if more than one juvenile is involved in a particular offense, efforts to differentiate among the juveniles as to culpability; and (7) the availability or unavailability of juvenile institutions. (*In re Patterson, Payne & Dyer*, supra at 250; and *State v. Green*, supra at 444.) The gravity of the misconduct alleged is not the controlling factor in determining the proper disposition of a juvenile offender. (*In re Patterson, Payne & Dyer*, supra at Syl. 2; and *State v. Green*, supra at 444.)

All of our past cases have been decided under our law as it stood before July 1, 1975. On that date K.S.A. 1975 Supp. 38-808 (*b*) became effective and prescribed slightly different factors for the district court to examine in determining whether a juvenile was a fit and proper subject to be dealt with under the Kansas Juvenile Code. The new law provides:

"Upon the completion of the hearing and a finding that the child was sixteen (16) years of age or older at the time of the alleged commission of the offense, the court may make a finding, noted in the minutes of the court, that the child is not a fit and proper subject to be dealt with under the Kansas juvenile code, and waive jurisdiction over the child. In determining whether or not such finding should be made, the juvenile court shall consider each of the following factors: (1) Whether the seriousness of the alleged offense is so great that the protection of the community requires waiver; (2) whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner; (3) the maturity of the child as determined by consideration of his or her home, environment, emotional attitude and pattern of living; (4) whether the alleged offense was against persons or against property, greater weight being given to offenses against persons, especially if personal injury resulted; (5) the record and previous history of the child; (6) whether the child would be amenable to the care, treatment and training program available through the facilities of the juvenile court; and (7) whether the interests of the child or of the community would be better served by the juvenile court waiving its jurisdiction over the child. The insufficiency of evidence pertaining to any one or more of the factors listed in this subsection shall not in and of itself be determinative of the issue of waiver of juvenile court jurisdiction. Written reports and other materials relating to the child's mental, physical, educational and social history may be considered by the court. . . ."

These numbered factors resemble the numbered factors in *Kent v. United States*, 383 U.S. 541, 566-567, 16 L. Ed. 2d 84, 86 S.Ct. 1045.

Although the difference between the new statute and our prior case law is slight, it must be recognized, as the trial court did, K.S.A. 1975 Supp. 38-808 (*b*) (now K.S.A. 1976 Supp. 38-808 [*b*]) controls this dispute.

The appellant first contends:

"The Court erred in the transfer of jurisdiction of the respondent to the adult court, by denying the respondent his due process rights, and equal protection under the law. The Court has insufficient evidence to meet the criterion for certification of the appellant."

It is conceded the appellant was over sixteen (16) and under eighteen (18) years of age and the alleged acts would be felonies if committed by an adult. The only question presented is whether the trial court's decision that the child is not a fit and proper subject to be dealt with under the Kansas Juvenile Code is supported by substantial competent evidence. (*State v. Lewis*, supra at 793; *State v. Green*, supra at 443; and *In re Patterson, Payne & Dyer*, supra at 250.)

The term "substantial evidence" has come to have a well-defined meaning in our law. It is said to be evidence possessing something of substance and relevant consequence, and which furnishes a substantial basis of fact from which the issues tendered can be reasonably resolved. (*State v. Green*, supra at 443; and *In re Templeton*, supra at 94.)

A comparison of the trial court's findings and K.S.A. 1975 Supp. 38-808 (*b*) indicates the trial court consciously followed the new statute. We shall not burden this opinion with further recitation of facts showing the appellant is not a fit and proper person to be dealt with under the Kansas Juvenile Code. Suffice it to say substantial competent evidence clearly supports the detailed findings of the trial court.

However, because the appellant has raised certain arguments as though the factors discussed in the case of *In re Patterson, Payne & Dyer*, supra, and *State v. Green*, supra, were controlling, we will examine those arguments.

The appellant argues no current report as to the social work situation is offered. The record reflects progress reports prepared by a psychologist and an intake summary were presented. The appellant has the burden of furnishing a record which affirmatively shows that prejudicial error occurred in the trial court. (*State v. Robertson*, 221 Kan. 409, 411, 559 P.2d 810; and *State v. Pettay*, 216 Kan. 555, 557, 532 P.2d 1289.) Therefore, we must assume the progress reports and intake summary brought the older files up-to-date and all of the available evidence was before the district court.

The appellant argues the record reflects a successful rehabilitation effort at Atchison. To the contrary, the record shows the appellant twice ran away from Atchison for short periods of time, was involved in activities not brought before the juvenile authorities and was diverted from five counts of felony prosecution shortly after his final discharge from Atchison. This does not constitute successful rehabilitation.

The appellant mentions the seriousness of the offense. While the gravity of the misconduct cannot be the controlling factor, the disposition of a case should be tailored to the offender. Here the serious act of shooting and wounding two law enforcement officers is a factor to consider in deciding whether the juvenile is a fit and proper person to be dealt with under the Kansas Juvenile Code. (K.S.A. 1975 Supp. 38-808 [b] [1].)

The appellant argues he could receive treatment at the AWL Unit of Topeka State Hospital and other units. However, Dr. Horne stated the AWL Unit insists on short-term treatment, 60-90 days, and rapid turnover. This facility would not aid the appellant. Dr. Horne testified:

". . . If you ask me is there a facility in the state that is designed and willing and ready and able to treat this boy, there isn't one."

Dr. Horne also ruled out Larned and the Youth Center at Topeka as suitable for the appellant.

Dr. Haines testified generally the Youth Center at Topeka (formerly BIS) took boys fourteen and one-half to sixteen years of age. The usual duration of the programs at the Osawatomie and Larned Youth Rehabilitation Units was designed to be within three to six months. Michael Patterson indicated no juvenile institutions would meet the needs of the appellant.

Clearly no place was shown to be adequate for the rehabilitation of the appellant in view of the appellant's age, history, violent acts and long-term prognosis for cure. The appellant mistakenly attempts to equate availability of institutions with institutions suitable for his rehabilitation.

The appellant next contends:

"The court erred in denying the respondent's motion to reconsider, in that mental illness on the part of the appellant is sufficient basis for retention of jurisdiction by the juvenile court. Specifically where the juvenile can be dealt with under the mental illness statutes."

The appellant places primary reliance on *Kent v. United States,* 401 F. 2d 408 (D.C. Cir. 1968). This opinion results from subsequent proceedings after the decision of the United States Supreme Court in *Kent v. United States,* 383 U.S. 541, 16 L.Ed. 2d 84, 86 S.Ct. 1045. There the District of Columbia Juvenile Court Act required "full investigation" and made the juvenile court records available to person having a "legitimate interest in the protection . . . of the child." Kent's counsel filed a motion in the juvenile court for a hearing on the question of waiver, and for access to a juvenile court's social service file which had been accumulated during Kent's probation for a prior offense. The juvenile court did not rule on these motions. Instead, it entered an order waiving jurisdiction, with the recitation that this was done after the required "full investigation."

The United States Supreme Court reversed on procedural grounds. It held a juvenile was entitled to a hearing, to access by his counsel to social records and probation or similar reports which presumably were considered by the juvenile court, and to a statement of the reasons for the juvenile court's decision sufficient to enable a meaningful appellate review.

On remand from the United States Supreme Court, testimony was introduced showing Kent suffered from a psychosis labeled "schizophrenic reaction, chronic undifferentiated type." There was reason to believe that a period of time beyond the limits of the juvenile court's jurisdiction was required for reasonable prospects of rehabilitation. Moreover, the juvenile court's long-term confinement facilities could not provide adequate psychiatric treatment for psychotic children. Therefore, Kent's counsel sought mental treatment and civil commitment. The district court found that Kent was indeed civilly committable in 1961, but waived jurisdiction.

The Court of Appeals for the District of Columbia reversed the waiver of juvenile jurisdiction. Chief Judge Bazelon, writing for the majority, said:

"Since waiver was not necessary for the protection of society and not conducive to Kent's rehabilitation, its exercise in this case violated the social welfare philosophy of the Juvenile Court Act. Of course, this philosophy does not forbid all waivers. We only decide here that it does forbid waiver of a seriously ill juvenile." (p. 412.)

A strong dissent was written by the now Chief Justice Warren Burger who argued:

"The majority opinion asserts that the District Court turned 'civil commitment law on its head' because it found that Kent's dangerousness was a factor to consider on the waiver issue. The majority view seems to be that if Kent were potentially dangerous to himself or others he should have been *committed*, not tried, and that neither the District Court nor the Juvenile Court could assert jurisdiction over him. But the District Court was not called upon to determine whether or not Kent should be committed—in which case dangerousness would be a factor in favor of commitment. It was asked instead to determine whether the Juvenile Court or the District Court should have original jurisdiction over Kent. Unless we are to say that the District Court had no duty to protect the public from Kent and Kent from himself, the District Court plainly was correct in weighing his dangerousness and trying to discern what were the best 'mechanisms by which society could be protected'—to borrow a phrase from Judge Bazelon. (Page 411).

"I suggest that it is the majority who turn the law 'on its head.' The District Court had a narrow issue before it—if Kent were not to be waived, all the procedures of the Juvenile Court would take over, but if he were waived, he would be like any other person charged with a serious crime. In the District Court he could assert absence of criminal responsibility and this could lead him to treatment at St. Elizabeths Hospital after verdict. Alternatively, the District Court could constitute itself as a juvenile court and have broader facilities than available to the Juvenile Court itself. . . ." (p. 414.)

In our opinion the view expressed by Chief Justice Burger represents the better view and the rule to be applied in this case.

This is in accord with the new statute regarding waiver of juvenile jurisdiction. K.S.A. 1975 Supp. 38-808 (*b*) provides in part:

". . . Written reports and other materials relating to the child's *mental, physical,* educational and social history may be considered by the court. . . ." (Emphasis added.)

This statute does not prescribe a *per se* rule regarding a juvenile's alleged mental illness and waiver of juvenile court jurisdiction. Mental illness is but one of the factors to be considered in making the determination of waiver.

Where a juvenile is alleged to be mentally ill, the juvenile court may retain jurisdiction. The juvenile court may then "commit such child to the state secretary of social and rehabilitation services," who in turn "may place the child in any institution operated by the director of mental health and retardation services." (Following K.S.A. 1976 Supp. 38-826 [*a*] [6] and K.S.A. 1976 Supp. 38-826 [*d*].) This was the procedure followed in the case of *In re Waterman,* 212 Kan. 826, 512 P.2d 466, where the

juvenile court refused to waive juvenile jurisdiction of a juvenile suffering from mental illness diagnosed as adjustment reaction of adolescence.

The juvenile court is not required to retain jurisdiction because of the alleged mental illness of the juvenile. A juvenile alleged to be psychotic or seriously mentally ill can raise the defense of insanity at his trial as an adult.

Even if this court considered the majority opinion in *Kent v. United States*, 401 F. 2d 408 (D.C. Cir. 1968), controlling, the instant case could be distinguished. In *Kent* the Court of Appeals was dealing with a juvenile who was suffering from chronic schizophrenic reactions. Here Dr. Horne's report found no indication of a schizophrenic thought disorder. Dr. Horne testified the appellant was psychotic on drugs but not otherwise.

*United States v. Howard*, 449 F.2d 1086 (D.C. Cir. 1971), is more nearly in line with the facts in the instant case. There the Court of Appeals for the District of Columbia upheld a waiver of juvenile jurisdiction. The court concluded the juvenile was not subject to civil commitment as a seriously ill juvenile, even though one psychologist testified the juvenile was a "borderline psychotic" and a second psychologist reported the juvenile was a "sociopath," where three psychiatrists found the juvenile showed no signs of mental illness. The Court of Appeals said the juvenile court was entitled to consider Howard's age and did not abuse its discretion in determining that Howard's rehabilitation within the presently available juvenile facilities would be unlikely. (See also *Strickland v. United States*, 449 F.2d 1131 [D.C. Cir. 1971].)

Similarly in *State v. Kemper*, 535 S.W. 2d 241 (Mo. App. 1976), the Missouri Court of Appeals, Kansas City District, distinguished *Kent* and rejected the contention of erroneous waiver where there was testimony a fifteen-year-old youth was suffering from "an adjustment reaction of adolescence characterized by schizoid and explosive tendencies," and "maladjustment. . . possessing some of the characteristics of schizophrenia." See also *Matter of Trader*, 20 Md. App. 1, 315 A.2d 528 (1974), reversed on other grounds, 272 Md. 364, 325 A.2d 398 (1974), where waiver was allowed despite testimony the youth's behavior was sociopathic and out of control.

Here the record discloses substantial evidence that successful rehabilitation treatment probably would be required to extend

beyond the appellant's twenty-first birthday. (*United States v. Howard*, supra; *Jimmy H. v. Superior Court*, 3 Cal. 3d 709, 91 Cal. Rptr. 600, 478 P.2d 32 [1970]; and *P. H. v. State*, 504 P.2d 837 [Alas. 1972].)

It should be noted waiver was upheld in *State v. Lewis*, supra at 792, under our prior juvenile law. There a psychiatric examination revealed an "anti-social psychopathic personality with a potential for explosiveness under stress" and a need for long-term institutional treatment.

Finally the appellant contends the trial court erred in refusing to permit testimony as to civil commitment.

During the waiver hearing, the following testimony of Dr. Haines was offered relative to civil commitment.

"Q. Does your department have control over commitment from the Probate Courts, civil commitment of individuals?
"A. For the department?
"Q. To mental hospitals from Probate Court.
"A. Right.
"Q. Are there facilities available through civil commitment for individuals who are 21 years of age and over?
"MR. YEOMAN: Your Honor, I object to this. We are not, again, here to assess what the Probate Court might be able to do. This is to determine what the Juvenile Court can do and whether the Probate Court can put people in the hospital or not is not relevant to this area.
"MR. PARRISH: Well, Your Honor, I believe that it is relevant inasmuch as we are talking about an individual who previous to this time has been described as one needing three to five years of treatment who is 17 and a half years old now and three to five years may extend beyond age 21. So if we are to decide whether the Juvenile Court and juvenile facilities can provide a program of treatment as has been described, then I think it is relevant to see where he might go after the age has been reached.
\* \* \* \* \*
"THE COURT: Sustained. I think that calls for a legal conclusion anyway and certainly the test is whether or not the respondent is amenable so far as facilities of Juvenile Court is concerned. It is not whether there are other courts which have facilities."

Later testimony brought out the fact the juvenile judge can commit to the social and rehabilitation department with a recommendation that the child be placed at the Topeka State Hospital.

Here the appellant was free to explore all the alternatives for the care, treatment and training program available through the facilities of the juvenile court, which the appellant did explore. It

was irrelevant on the issue of waiver of juvenile court jurisdiction to examine the facilities available to the probate court after the appellant reached age twenty-one, and was no longer within juvenile court jurisdiction. (K.S.A. 1976 Supp. 38-806 [c].)

The judgment of the lower court is affirmed.