708 So.2d 391 (1998)
In re C.B., R.B., T.C., R.C., S.C., et al.
No. 97-KA-2783.
Supreme Court of Louisiana.
March 4, 1998.
*392 William L. Kline, Clinton, Martha S. Morgan, Baton Rouge, Richard P. Ieyoub, Attorney General, Carlos M. Finalet, III, Baton Rouge, for Applicant.
Stephen Dixon, Baton Rouge, David J. Utter, New Orleans, for Respondent.
David Lambert, Natchitoches, for amicus curiae National Center of Youth Law.
CALOGERO, Chief Justice.[*]
This case presents an important issue which brings into focus the competing interests of governmental necessity and constitutional principle, having to do with the incarceration of juveniles adjudicated delinquent and the shortage of bed space within the juvenile facilities. The case comes to us because the Legislature passed a statute authorizing the Department of Public Safety and Corrections to promulgate a regulation requiring juveniles who have been adjudicated delinquent (not convicted of a crime) to be transferred to adult facilities upon reaching the age of seventeen. During their confinement in the adult facility, they are, according to the regulation promulgated by the Department of Public Safety and Corrections, to be treated for punitive purposes the same as the convicted adult felons with whom they are confined. The juvenile court judge determined that both the statute and the regulation violated the juveniles' due process rights, and therefore did not pass constitutional muster. The case comes to this Court on direct appeal by the State under Article V, § 5(D) of the Louisiana Constitution.

*393 FACTS AND PROCEDURAL HISTORY
On December 10, 1996, the Office of Juvenile Justice and Delinquency Prevention of the United States Department of Justice published in the Federal Register revised rules pertaining to the requirement of sight and sound separation between incarcerated juveniles and adults. Prior to these revisions, the states, and in particular Louisiana, would lose federal funding in the event of non-compliance with the sight and sound separation requirement. Recognizing that state laws were increasingly providing for the transfer of adjudicated delinquents to adult facilities upon their attaining the age of full criminal responsibility under state law, one of these revisions provided that the separation requirement is not violated as a result of contact between adjudicated delinquents and adult offenders once the adjudicated delinquent has reached the full age of criminal responsibility established by state law, provided that the transfer (or placement) of the adjudicated delinquent is required or authorized under state law. Rules and Regulations, Department of Justice, 61 Fed.Reg. 65, 132 (1996) (codified at 28 C.F.R. § 31 (1996)).
Subsequent to this revision, the Louisiana Legislature enacted Act 1063 (House Bill 1253), effective July 14, 1997, which is now found at LSA-RS 15:902.1. That statute reads in pertinent part:
Notwithstanding Title VIII of the Louisiana Children's Code or any other provision of law, the secretary of the department may promulgate rules and regulations to authorize the transfer of adjudicated juvenile delinquents to adult correctional facilities when the delinquents have attained the age of seventeen years, the age of full criminal responsibility.
LSA-RS 15:902.1
The stated policy behind the passage of the Act was to create space in the local juvenile facilities for younger juveniles. (House Committee on Administration of Criminal Justice, Minutes of the May 7, 1997 meeting, 1997 Regular Session). Pursuant to this statute, the secretary promulgated regulation B-02-008, published in the August 1997 issue of the Louisiana Register, as an emergency rule.[1] That emergency rule provided the policy and procedures by which the juveniles would be transferred. Pursuant to Section D(1) of the regulation, juvenile offenders who are adjudicated delinquent for an offense that, if committed by an adult, could not result in a sentence at hard labor, are not eligible for transfer. Juveniles can generally be transferred to one of the following five adult correctional facilities: Adult Reception and Diagnostic Center; Elayn Hunt Correctional Center; Wade Reception and Diagnostic Center; David Wade Correctional Center; and Louisiana Correctional Institute for Women. 23 Louisiana Register 22:335(D)(3) (August, 1997). Transferred juveniles will not have a parole or diminution of sentence release date. Rather, they will have a "full term date," which will in no circumstance exceed the juveniles' twenty-first birthday. Id. at 22:335(D)(4). Juveniles may still be recommended for early release by the adult facility, which must report the location and condition of the juvenile to the juvenile court every six months. Id. at 22:335(E)(10). Transferred juveniles are to participate in all work, education, and other rehabilitative programs on the same basis as adult inmates and will be subject to the same disciplinary processes. Id. at 22:335(D)(5). Juvenile records are to remain confidential. Id. at 22:335(D)(6).
The transfer procedure set out in the regulation provides for the creation of a classification committee which is to be formed at all juvenile facilities to review all relevant information to identify offenders for eligibility and suitability for transfer. Id. at 22:335(E)(1). Eight factors are to be considered by the committee when evaluating a juvenile for possible transfer. They are as follows: (1) chronological age of 17 years old or older; (2) emotional and physical maturity; *394 (3) disciplinary history and potential to disrupt juvenile institutional operations; (4) potential to benefit from educational programs; (5) potential to benefit from other programs; (6) diagnosis with mental health and/or special medical needs that can be better served in an adult facility; (7) those juveniles who pose a security risk, i.e. considered escape risks, exhibit violent behavior, committed for a serious offense, or have extensive criminal histories; and (6) to accomplish one of the following objectives: (a) minimize risk to the public; (b) minimize risk to the institutional staff; (c) minimize risk to other offenders. Although the juvenile's disciplinary history is a factor for consideration, the transfer itself is not to be construed as a disciplinary sanction. After recommendation by the classification committee, the warden of each juvenile facility reviews the recommendation and makes the final decision relative to transfer. According to Section E(5) of the regulation, once a juvenile is transferred to an adult facility, that juvenile will not be returned to a secure juvenile facility within the Department of Public Safety and Corrections, and any subsequent placement in a non-secure juvenile program is considered generally inappropriate.[2]
Following passage of the Act and the promulgation of the emergency regulation, the Department of Public Safety and Corrections transferred the first group of thirty-two juveniles from juvenile facilities to adult facilities. On September 3, 1997, the five named juveniles[3] filed a "Motion to Stay Transfers to Adult Prisons" and an "Application for Preliminary Injunctive Relief" in the Juvenile Court for East Baton Rouge Parish. In addition to the five named juveniles, "John Doe and Other Juveniles Adjudicated but Unknown Who Have Attained the Age of Seventeen and Are in State's Custody" were listed as petitioners. The petitioners contended in these pleadings that LSA-RS 15:902.1 violated Equal Protection, Due Process, and Ex Post Facto protections, as well as the constitutional guarantees against cruel and unusual punishment. The petitioners further argued that the statute was unconstitutional on its face because it derogates from the constitutional mandate of "special" treatment for juvenile offenders. The juvenile court held that under Article V, § 19 of the Louisiana Constitution,[4] juveniles have a liberty interest in juvenile correctional treatment, and that neither LSA-RS 15:902.1 nor the regulation passed constitutional muster because neither provided the juveniles adequate procedural due process to justify deprivation of that liberty interest. The juvenile court further concluded that the petitioners had satisfied the burden of showing irreparable injury in that LSA-RS 15:902.1 violated their due process rights, and the court granted the application for injunctive relief enjoining the Department from effectuating further transfers.[5] The Department filed a Motion to Stay the trial court's ruling in this Court. It was denied.[6] Subsequently, the petitioners sought, in this Court, a statewide stay of the transfer of juveniles to adult facilities. That too was denied.[7]
*395 In this Court, the State and the Department assign four errors. They are as follows: (1) LSA-RS 15:902.1 does not violate the Ex Post Facto Clauses of the State or Federal Constitutions; (2) LSA-RS 15:902.1 does not violate the Due Process Clauses of the State or Federal Constitutions; (3) LSA-RS 15:902.1 does not violate the Equal Protections Clauses of the State or Federal Constitutions; and (4) LSA-RS 15:902.1 does not violate the state and federal prohibitions against cruel and unusual punishment.
The Department of Public Safety and Corrections makes the following two additional assignments of error: (1) the lower court erred in determining that the petitioners met their burden of establishing irreparable injury in support of their motion for a permanent injunction; and (2) the Prison Litigation Reform Act prohibited the court from issuing a permanent injunction. In addition to the constitutional arguments asserted in the lower court, the appellees assert in this Court that the transfer statute is an unconstitutional violation of the separation of powers doctrine under Article II, § 2 of the Louisiana Constitution.
We agree with the juvenile court that there exist constitutional infirmities in the transfer of adjudicated juveniles to adult facilities under the current legislation. We so hold, however, based upon a different constitutional argument than that relied upon by the juvenile court. We hold that LSA-RS 15:902.1 is unconstitutional as applied by Regulation B-02-008 as it denies the juveniles their constitutional right to due process, and fundamental fairness inherent therein, guaranteed them by Article I, § 2 of the Louisiana constitution because they receive a de facto criminal sentence to hard labor without being afforded the right to trial by jury as is mandated by Article I, § 17 of our state constitution.
Because we find the statute as applied violates our state constitution, we will not address whether these same constitutional infirmities would also be present at the federal level. Additionally, the particular legal basis of our holding obviates the need for us to address the Equal Protection, Ex Post Facto, separation of powers, Procedural Due Process,[8] and cruel and unusual punishment arguments advanced by the parties. Moreover, because we find the statute constitutionally infirm as it is applied, the Department of Public Safety and Correction's argument that the petitioners failed to establish irreparable injury to justify the award of an injunction is without merit. For this same reason, we decline to rule on the applicability of the Prison Litigation Reform Act to this case.

DISCUSSION
The juvenile justice system, dating back to the early 1900's, was founded as a way to nurture and rehabilitate youthful offenders. Janet E. Ainsworth, ReImagining Childhood and Reconstructing the Legal Order: The Case for Abolishing the Juvenile Court, 69 N.C. L.Rev. 1083, 1096-97 (1991); see also, Barry C. Feld, Violent Youth and Public Policy: A Case Study of Juvenile Justice Law Reform, 79 Minn. L.Rev. 965, 969 (1995). The criminal behavior of juveniles was seen as a "symptom" of a breakdown in parental control which required state intervention to save them from a life of criminal behavior, and thus, retributive punishment was deemed inappropriate. Ainsworth, supra at 1097-98. The "hallmark" of the juvenile system "was its disposition, individually *396 tailored to address the needs and abilities of the juvenile in question." Id. at 1099. Indeed, our own state's system was founded upon this premise as is reflected in the stated purpose of our Children's Code, "[In] those instances when [the child] is removed from the control of his parents, the court shall secure for him care as nearly as possible equivalent to that which the parents should have given him." La. Ch.Code Ann. art. 102 (West, 1995).
The changing nature of juvenile crime, however, has engendered changes in the nature of the juvenile delinquency adjudication which have blurred the distinction between juvenile and adult procedures. The Children's Code now grants to juveniles adjudicated in juvenile court proceedings essentially all rights guaranteed to criminal defendants by the federal and state constitutions, except the right to trial by jury. La. Ch. C. Ann. art. 808 (West, 1995). Additionally, the Louisiana Legislature has, with recent amendments to the Children's Code, blurred the distinction between the juvenile and adult court systems. Juvenile delinquency cases involving crimes of violence as defined by LSA-RS 14:2(13) are open to the public, which essentially destroys the confidentiality of certain juvenile proceedings. See La. Ch. C. Ann. art. 407(A), amended by 1994 La. Acts 120. The Habitual Offender Law provides that juvenile adjudications for drug offenses or crimes of violence, as defined by LSA-RS 15:529.1, may be used to enhance subsequent felony offenses. LSA-RS 15:529.1 (West Supp., 1998). Prior to this change, juvenile adjudications were sealed and did not follow an individual into adulthood.
Consequently then, the once heralded distinctions between juvenile and adult proceedings in this state are fast diminishing, and are further accelerated by the statute currently before us. The issue now becomes how much of the unique nature of the juvenile procedures can be eroded before due process requires that the juveniles be afforded all the guarantees afforded adult criminals under the constitution, including the right to trial by jury. We now turn to the applicable legal principles for guidance on this issue.
Article V, § 19 of the Louisiana Constitution reads in pertinent part as follows: "The determination of guilt or innocence, the detention, and the custody of a person who is alleged to have committed a crime prior to his seventeenth birthday shall be pursuant to special juvenile procedures which shall be provided by law." (emphasis added). This Court has recognized that this specific language in the article was the effect of a compromise by the Constitutional Convention delegates in the final days of the convention to ensure that legislation pertaining to juvenile court jurisdiction would consider "separate juvenile procedures when [determining] how a person should be tried...." State in Interest of Banks, 402 So.2d 690, 694 (La. 1981) (emphasis added) (citing XXXVIII State of Louisiana Constitutional Convention of 1973: Verbatim Transcripts, Jan. 15, 1974, at 62 (remarks of Mr. Derbes)). Consequently, this Court has founded upon Article V, § 19 a general rule of "non-criminal" treatment of juveniles.[9]See State v. Perique, 439 So.2d 1060 (La.1983); State in the Interest of Hunter, 387 So.2d 1086 (La.1980); State v. Everfield, 342 So.2d 648, 655 (La. 1977); State ex rel. Moore v. Warden, Penitentiary at Dequincy, 308 So.2d 749, 752 (La.1975). "Non-criminal" treatment is determined to mean that adult criminal treatment was the exception, and that juveniles were not to be punished as adults, except as provided by the constitution. Hunter, 387 So.2d at 1088; Moore, 308 So.2d at 752.
Thus, the unique nature of the juvenile system is manifested in its non-criminal, *397 or "civil," nature, its focus on rehabilitation and individual treatment rather than retribution, and the state's role as parens patriae in managing the welfare of the juvenile in state custody. See McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971); Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); In re T.M., 742 P.2d 905, 907 (Colo.1987). Consequently, there has been recognized in the juvenile system a "quid pro quo" under which juveniles who are placed in adult facilities without the safeguards of due process that are enjoyed by adults will receive in return rehabilitative treatment rather than mere punitive incarceration. Doe v. McFaul, 599 F.Supp. 1421, 1428 (N.D.Ohio, 1984); Baker v. Hamilton, 345 F.Supp. 345, 352 (W.D.Ky.1972); Osorio v. Rios, 429 F.Supp. 570, 574 (D.C.Puerto Rico, 1976).
It is this policy that has guided this Court and others in determining which constitutional rights are guaranteed to juveniles under the dictates of fundamental fairness, inherent in the due process clause, beginning with the determination that the applicable due process standard in juvenile proceedings is fundamental fairness. In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); Banks, supra, 402 So.2d 690 (La.1981); In re Causey, 363 So.2d 472 (La.1978). Because of the fundamental differences between the adult and juvenile systems, however, due process, and implicitly fundamental fairness, do not require that every constitutional right guaranteed to adults be automatically granted to juveniles. See McKeiver, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647; Causey, 363 So.2d at 474; Banks, 402 So.2d at 694. Certain procedural safeguards found in the Fifth and Sixth Amendments to the Federal Constitution, such as the right to trial by jury, the right to confrontation and cross-examination of witnesses, and the right against self-incrimination, have been incorporated through the Fourteenth Amendment's Due Process Clause to apply to state criminal cases. See Duncan v. Louisiana, 391 U.S. 145, 148, 88 S.Ct. 1444, 1446-47, 20 L.Ed.2d 491 (1968) (discussing incorporation of federal rights into state law by the Fourteenth Amendment). These rights, however, have not automatically been extended to the juvenile delinquent during the adjudication process. McKeiver, 403 U.S. at 541, 91 S.Ct. at 1984. Because of the non-criminal nature of juvenile proceedings, these safeguards do not apply to juveniles by virtue of the Incorporation Doctrine, but rather through the concept of fundamental fairness inherent in the Due Process Clause of the Fourteenth Amendment. Id. The Due Process Clause of the Fourteenth Amendment commands not a particular procedure, but only a fundamentally fair result. Id. at 554, 91 S.Ct. at 1990-91. (Brennan, J. concurring in part and dissenting in part).
The Declaration of Rights (Article I) of the 1974 Louisiana Constitution embodies and often amplifies the protection of certain individual rights afforded by the United States Supreme Court interpretations of the Fourteenth Amendment and the Bill of Rights. State v. Perry, 610 So.2d 746, 755 (La.1992); Guidry v. Roberts, 335 So.2d 438, 448 (La.1976). Therefore, Article I, § 2 of our state constitution, which guarantees to our citizens due process of law[10], embodies the fundamental fairness guarantees inherent in its federal counterpart. Thus, fundamental fairness is the standard by which our Court is to decide whether a particular safeguard in a juvenile delinquency adjudication is required in order to satisfy the "essentials of due process and fair treatment" found in Article I, § 2 of our constitution. Winship, 397 U.S. at 359, 90 S.Ct. at 1070; Banks, supra, 402 So.2d 690 (La.1981); Causey, supra, 363 So.2d 472 (La.1978).
In determining which due process rights are guaranteed to juveniles by the Louisiana Constitution, this Court has adopted the case-by-case analysis of juvenile proceedings employed by the United States Supreme Court. Causey, 363 So.2d at 474; See Banks, supra, 402 So.2d 690; In re Batiste, *398 367 So.2d 784 (La.1979); In re Dino, 359 So.2d 586 (La.1978). Under this analysis, an attempt is made to "strike a judicious balance by injecting procedural orderliness into the juvenile court system ... to reverse the trend whereby `the child receives the worst of both worlds: that he gets neither the protections accorded to adults nor the solicitous care and regenerative treatment postulated for children.'" McKeiver, 403 U.S. at 545, 91 S.Ct. at 1986 (quoting Kent v. United States, 383 U.S. 541, 556, 86 S.Ct. 1045, 1054, 16 L.Ed.2d 84 (1966)). In so doing, an inquiry is made into whether the right asserted was historically part of fundamental fairness and whether giving the particular right in question to the juvenile offender would hamper any of the beneficial aspects of a juvenile proceeding. Causey, 363 So.2d at 474 (citing McKeiver, supra; Winship, supra; Gault, supra). Accordingly, this Court noted that, "Only those rights that are both `fundamental' and `essential,' in that they perform a function too important to sacrifice in favor of the benefits afforded by the civil-style juvenile proceeding, have been held to be required in such proceedings." Causey, 363 So.2d at 474. Consequently, this Court has determined, inter alia, that the juvenile has a right to plead not guilty by reason of insanity and a right to a hearing to determine his mental capacity in his defense, Causey, 363 So.2d 472, the right to bail pending adjudication, State v. Hundley, 263 La. 94, 267 So.2d 207 (1972); In re Aaron, 390 So.2d 208 (La.1980), and the right to a public trial, Dino, 359 So.2d at 586.
This Court, however, based on the United States Supreme Court's reasoning in McKeiver, supra, determined that due process and fundamental fairness did not require that the juvenile be granted the right to trial by jury; a right that is guaranteed by Article 1, § 17[11] of our state constitution in certain criminal cases.[12] (emphasis added). Dino, 359 So.2d at 597-98. Prior to McKeiver, in Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), the Court had held that the jury trial was fundamental to the American scheme of justice and was guaranteed to state criminal defendants via the Fourteenth Amendment in order to prevent governmental oppression by protecting the accused from arbitrary judicial action through the interposition of the "common sense judgment" of a jury between the accused and his adversary. Duncan, 391 U.S. at 155-56, 88 S.Ct. at 1450-51. In McKeiver, however, the Supreme Court determined that the Sixth Amendment of the Federal Constitution did not automatically apply in juvenile adjudications because the nature of the juvenile proceeding had yet to be held "criminal" within the meaning of the Sixth Amendment, despite the presence of some criminal aspects. Id. at 541, 91 S.Ct. at 1984. The "civil" qualities of the juvenile system, then, primarily its focus on rehabilitative goals and flexibility, proscribed the Court's perfunctorily granting a trial by jury to juveniles. Additionally, the Court focused on the role of the jury as a "factfinder," (presumably because its role in Duncan as a safeguard against judicial oppression had, at least in theory, no place in a juvenile adjudication) and noted that the imposition of a jury trial would not "strengthen greatly, if at all, the factfinding function, and would, contrarily, provide an attrition of the juvenile court's assumed ability to function in a unique manner." McKeiver, 403 U.S. at 547, 91 S.Ct. at 1987.
The McKeiver opinion, however, found itself caught between a desire to uphold the separate existence of the juvenile system, its "informality, inflexibility, [and] speed," and the disturbing conclusion that the juvenile system had not lived up to its high expectations, that often "the juvenile judge falls far short of that stalwart, protective, and communicating figure the system envisaged." McKeiver, 403 U.S. at 534, 544, 91 S.Ct. at 1981, 1985-86. The Court, at that time, was not yet ready to spell the doom of the juvenile court system by requiring jury trials in juvenile adjudications. The Court, however, recognized the tentative nature of its plurality *399 opinion by noting the following, "If the formalities of the criminal adjudicative process are to be superimposed upon the juvenile court system, there is little need for its separate existence. Perhaps that ultimate disillusionment will come one day, but for the moment, we are disinclined to give impetus to it." Id. at 551, 91 S.Ct. at 1989. Implicit in this statement is the Court's belief that this issue may one day be ripe for revisiting.
The enactment of LSA-RS 15:902.1 leads us to the conclusion that that day has come. The determination that a jury trial was not constitutionally required in juvenile adjudications was predicated upon the non-criminal treatment of the adjudicated juvenile delinquent. It therefore stands to reason that if the civil trappings of the juvenile adjudication are sufficiently subverted, then a proceeding without that safeguard is fundamentally unfair, and thus, violative of due process. With these legal principles established, we turn to the issue now confronting this Court, which is the constitutionality of transferring adjudicated juvenile delinquents to penal facilities, where they will be required to perform hard labor, without first affording them the opportunity to have a jury trial.
Prior to the creation of a juvenile court system in Louisiana, juvenile offenders were incarcerated with adults in the Louisiana State Penitentiary. Mark T. Carleton, Politics and Punishment 95 (Louisiana State University Press) 1971. They were not, however, denied the right to a trial by jury before receiving such a sentence. See State v. Jones, 3 So. 57 (La.1887) (14 year-old defendant received jury trial in rape case). At or around the turn of the century, spurred by a state prison reform movement, the Louisiana General Assembly began discussion of the establishment of a reformatory branch of the State Penitentiary which would house juveniles between the ages of seven and seventeen apart from the adult inmates. Carleton, supra at 95-96. Construction of this reformatory began in 1908, the same year in which Act No. 83 established the juvenile court system. Id. Section 17 of the Act specified that where the delinquency charge would, regarding an adult, amount to a crime punishable at hard labor, "[the judge could] commit said child to the State Reformatory, and in all other cases, to the State Reformatory or to any other institution within the State organized for the case of delinquent children." 1908 La. Acts 83. This Court in State v. Prater, 125 La. 573, 51 So. 647 (1910), interpreted Act 83 to mean that children were no longer to be confined in the penitentiary alongside adult inmates, stating that "the fundamental idea [behind its passage was] the reformation, not the punishment, of the child." Prater, 51 So. at 648. The legislation before us today represents a wholesale reversal of one hundred years of state policy wherein adjudicated juvenile delinquents have been treated in a non-criminal fashion. They are now being transferred to adult penal institutions without having been afforded a right to trial by jury.
LSA-RS 15:902.1 as applied in conjunction with Regulation B-02-008, transfers juveniles to adult facilities where they are to be treated no differently than the adult felons with whom they are confined. According to the regulation, they are to participate in all work programs on the same basis as the adult prisoners and will be subject to the same disciplinary procedures. 23 Louisiana Register 22:335(D)(5) (August, 1997). Testimony from the juveniles who had been transferred, as well as from the Department, indicates that the transferred juveniles will be, and are being, subjected to hard labor just as any other adult felon already confined in the adult facility. (R. 51, 245).[13] Additionally, if transferred at age seventeen and confined in the adult facility until age twenty-one, the juvenile will face up to four years in the adult prison. See Osorio, 429 F.Supp. at 576 (protracted confinement in adult facility, as opposed to brief period, requires juvenile be granted same procedures available to adult inmates). Hard labor is by its nature punitive. It is a punishment reserved for convicted felons. See LSA-RS 13:2(4) (West, 1983) (defining "felony" as a crime for which the offender may be sentenced to hard labor). Under Article 1, § 17 of our state constitution, the severity of the hard labor punishment *400 triggers the necessity for a jury trial to safeguard the due process rights of those who may be subjected to it. See Duncan, 391 U.S. at 145, 88 S.Ct. at 1445 (penalty authorized for a particular crime is of major relevance in determining whether its severity subjects the trial to the mandates of the Sixth Amendment). That article provides in pertinent part, "A [criminal] case in which the punishment may be confinement at hard labor ... shall be tried before a jury ...." (emphasis added). Although there is no difference in treatment in the penal aspects of their confinement, the transferred juveniles differ from their fellow adult inmates in that they have been confined to a penal institution without the entitlement to a trial by jury. In effect, then, these transferred juveniles, who by virtue of their adjudication in juvenile court have not been convicted of any crime, are receiving a de facto sentence to hard labor; a criminal sentence heretofore reserved by law only for persons convicted of serious felony offenses. Moreover, they do so without the procedural safeguards mandated by Article 1, § 17 of the state constitution. The indistinguishable punitive treatment of adults and juveniles may be facilitated only by granting juveniles a jury trial, the same due process protection that is afforded adults under Article I, § 17 who are sentenced to perform hard labor. See Baker, 345 F.Supp. at 352; Osorio, 429 F.Supp. at 576; Inmates of Boys' Training School v. Affleck, 346 F.Supp. 1354, 1368 (D.R.I.1972) (citing Londerholm v. Owens, 197 Kan. 212, 416 P.2d 259, 269 (1966)).
We therefore hold that the statute through its corresponding regulation has sufficiently tilted the scales away from a "civil" proceeding, with its focus on rehabilitation, to one purely criminal. Due process and fundamental fairness therefore require that the juvenile who is going to be incarcerated at hard labor in an adult penal facility must have been convicted of a crime by a criminal jury, not simply adjudicated a delinquent by a juvenile court judge. To deprive the juvenile of such an important procedural safeguard upsets the quid pro quo under which the juvenile system must operate. The hallmark of special juvenile procedures is their non-criminal nature. If, after adjudication in the juvenile court, the juvenile can be committed to a place of penal servitude and required to perform hard labor alongside convicted felons, then "the entire claim of parens patriae becomes a hypocritical mockery." Londerholm v. Owens, 197 Kan. 212, 416 P.2d 259, 269 (1966). In such a case, dispensation of the traditional safeguard of a jury trial cannot meet the basic requirements of fundamental fairness implicit in the due process clause of Article I, § 2 of our state constitution.
For the foregoing reasons, LSA-RS 15:902.1 as applied by Regulation B-02-008 is declared unconstitutional as it violates the due process clause of our state constitution. In so far as it is consistent with our holding, the juvenile court's judgment is therefore affirmed but for the reasons stated in this opinion.[14]

DECREE
JUVENILE COURT JUDGMENT INSOFAR AS IT DECLARES LSA-RS 15:902.1 AND REGULATION B-02-008 UNCONSTITUTIONAL AFFIRMED.
MARCUS, J., concurs and assigns reasons.
MARCUS, Justice, concurring.
I agree that R.S. 15:902.1 is not facially unconstitutional as applied by Regulation B-02-008. A proper regulation may cure constitutional infirmities and pass constitutional muster. Accordingly, I respectfully concur.
NOTES
[*] Traylor, J., not on panel. Rule IV, Part 2, § 3.
[1] The Department of Public Safety and Corrections published notice of its intent to formally adopt this rule, 23 Louisiana Register 22:335 (August, 1997); however, before it could do so, a second emergency rule was enacted on November 6, 1997. This second emergency rule is not properly before this Court for review as it was not in effect at the time of the challenged transfers.
[2] This provision prohibiting the transfer of the juvenile back to a secure juvenile facility, formerly Section E(5), has been deleted in the new emergency rule, a rule which, incidentally, is not before us in this case. See supra, n. 1.
[3] Three of those named juveniles were transferred in late August, 1997. The remaining two, S.C. and R.C., were not transferred because of the trial court's order. After the trial court's judgment, the three who had been transferred were ordered by the juvenile court to be returned to an appropriate juvenile facility.
[4] Article V, § 19 of the 1974 Louisiana Constitution states in pertinent part, "The determination of guilt or innocence, the detention, and the custody of a person who is alleged to have committed a crime prior to his seventeenth birthday shall be pursuant to special juvenile procedures which shall be provided by law."
[5] The trial court found it unnecessary to entertain the other constitutional arguments before it, Equal Protection, Ex Post Facto, and cruel and unusual punishment.
[6] In re C.B., 97-KA-2783, 11/25/97.
[7] In re C.B., 97-KA-2783, 12/10/97. As a consequence, juveniles adjudicated delinquent aged seventeen and over continue to be transferred to adult facilities throughout the state, except in East Baton Rouge Parish where the juvenile court in this case issued a permanent injunction staying the transfer of juveniles in that parish.
[8] The juvenile court judge held that the failure of both the statute and the regulation to provide the juveniles notice and a fair hearing prior to transfer to the adult facility violated the juveniles' procedural due process rights. Having decided that the statute is unconstitutional as applied by the regulation, we need not address that portion of the juvenile judge's decision. Furthermore, the corrective regulation enacted November 6, 1997, may now render this argument moot (although the appellees urge that the new regulation is still constitutionally infirm). See supra, n. 1. The corrective regulation added to the general transfer procedure the requirement that the juvenile be given 24-hour notice of the proposed transfer, and that the juvenile be allowed to appear before the Classification Committee to provide input in the decision to transfer. The juvenile is allowed to have a staff representative assist him under the procedures outlined in the "Disciplinary Rules and Procedures for Juvenile Offenders." 23 Louisiana Register 22:I.335(7)(A)(1) (November, 1997). As this new regulation was not in effect at the time of the transfers of the named juveniles in this case, it is not properly before us.
[9] This policy was called into question in State v. Perique, 439 So.2d 1060 (La.1983). The context in which this policy was questioned, however, was a constitutional challenge to LSA-RS 13:1570, now repealed by Acts 1991, No. 235, § 17, which excluded from the juvenile courts' jurisdiction proceedings involving juveniles who were charged with committing violent felonies. While it is true that the Legislature has seen fit to remove from the protections of the juvenile court system certain juveniles charged with violent felonies, and that Article V, § 19 sanctions such legislation, this by no means abrogates the rule that those juveniles who are adjudicated delinquent under the jurisdiction of the juvenile court system are still to be afforded the "non-criminal" treatment that this Court has traditionally held to be implicit in "special juvenile procedures."
[10] Article I, § 2 reads, "No person shall be deprived of life, liberty, or property, except by due process of law."
[11] Article I, § 17 of the Louisiana Constitution is our state counterpart to the Sixth Amendment of the Federal Constitution which grants the right to trial by jury to certain criminal defendants.
[12] This Court has defined "criminal cases" referred to in Article I, § 17 as a cases in which the defendant's guilt or innocence is at issue. State v. Williams, 326 So.2d 815, 818 (La.1976).
[13] We note that the amended regulation contains the same provision.
[14] The juvenile court opinion did not differentiate between the constitutionality of the statute on its face versus as applied by the regulation.